# HOLLAND *v.* ILLINOIS

No. 88–5050.   Argued October 11, 1989—Decided January 22, 1990

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, O'CONNOR, and KENNEDY, JJ., joined. KENNEDY, J., filed a concurring opinion, *post*, at p. 488. MARSHALL, J., filed a dissenting opinion, in which BRENNAN and BLACKMUN, JJ., joined, *post*, at p. 490. STEVENS, J., filed a dissenting opinion, *post*, at p. 504.

*Donald S. Honchell* argued the cause for petitioner. With him on the briefs were *Randolph N. Stone, Alison Edwards,* and *Ronald P. Alwin.*

*Inge Fryklund* argued the cause for respondent. With her on the brief were *Neil F. Hartigan,* Attorney General of Illinois, *Robert J. Ruiz,* Solicitor General, *Terence M. Madsen,* Assistant Attorney General, and *Cecil A. Partee.**

JUSTICE SCALIA delivered the opinion of the Court.

The questions presented by this case are (1) whether a white defendant has standing to raise a Sixth Amendment

---

**Steven R. Shapiro, Julius LeVonne Chambers,* and *Charles Stephen Ralston* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging reversal.

challenge to the prosecutor's exercise of peremptory challenges to exclude all black potential jurors from his petit jury, and (2) whether such exclusion violates his Sixth Amendment right to trial by an impartial jury.

## I

Petitioner Daniel Holland was charged in the Circuit Court of Cook County, Illinois, with aggravated kidnaping, rape, deviate sexual assault, armed robbery, and aggravated battery. According to his allegations, a venire of 30 potential jurors was assembled, 2 of whom were black. Petitioner's counsel objected to those of the State's peremptory challenges that struck the two black venire members from the petit jury, on the ground that petitioner had a Sixth Amendment right to "be tried by a representative cross section of the community." App. 7–8. The trial judge overruled the objection, and petitioner was subsequently convicted of all except the aggravated battery charge. The convictions were reversed by the Illinois Appellate Court, First District, 147 Ill. App. 3d 323, 497 N. E. 2d 1230 (1986), on grounds that are irrelevant here, but on further appeal by the State were reinstated by the Illinois Supreme Court, which rejected petitioner's Equal Protection Clause and Sixth Amendment challenges to the exclusion of the black jurors. 121 Ill. 2d 136, 520 N. E. 2d 270 (1987). We granted Holland's petition for certiorari asserting that the Sixth Amendment holding was error. 489 U. S. 1051 (1989).

## II

The threshold question is whether petitioner, who is white, has standing to raise a Sixth Amendment challenge to the exclusion of blacks from his jury. We hold that he does.

In *Batson* v. *Kentucky*, 476 U. S. 79, 96 (1986), we said that to establish a prima facie Equal Protection Clause violation in the discriminatory exclusion of petit jurors, the defendant "must show that he is a member of a cognizable racial

group . . . and that the prosecutor has exercised peremptory challenges to remove from the venire *members of the defendant's race.*" (Emphasis added.) We have never suggested, however, that such a requirement of correlation between the group identification of the defendant and the group identification of excluded venire members is necessary for Sixth Amendment standing. To the contrary, our cases hold that the Sixth Amendment entitles every defendant to object to a venire that is not designed to represent a fair cross section of the community, whether or not the systematically excluded groups are groups to which he himself belongs. See, *e. g.*, *Duren* v. *Missouri*, 439 U. S. 357 (1979); *Taylor* v. *Louisiana*, 419 U. S. 522 (1975). Thus, in *Taylor*, we found standing in circumstances analogous to petitioner's:

> "The State first insists that Taylor, a male, has no standing to object to the exclusion of women from his jury. But Taylor's claim is that he was constitutionally entitled to a jury drawn from a venire constituting a fair cross section of the community and that the jury that tried him was not such a jury by reason of the exclusion of women. Taylor was not a member of the excluded class; but there is no rule that claims such as Taylor presents may be made only by those defendants who are members of the group excluded from jury service." *Id.*, at 526.

Of course, in this case petitioner seeks an extension of the fair-cross-section requirement from the venire to the petit jury—but that variation calls into question the scope of the Sixth Amendment guarantee, not his standing to assert it. We proceed, then, to the merits of the claim.

### III

Petitioner asserts that the prosecutor intentionally used his peremptory challenges to strike all black prospective jurors solely on the basis of their race, thereby preventing a distinctive group in the community from being represented

on his jury. This, he contends, violated the Sixth Amendment by denying him a "fair possibility" of a petit jury representing a cross section of the community. Petitioner invites us to remedy the perceived violation by incorporating into the Sixth Amendment the test we devised in *Batson* to permit black defendants to establish a prima facie violation of the Equal Protection Clause. Under petitioner's approach, a defendant of any race could establish a prima facie violation of the Sixth Amendment by objecting to the use of peremptory challenges to exclude all blacks from the jury. The burden would then shift to the prosecutor to show that the exercise of his peremptory challenges was not based on intentional discrimination against the black potential jurors solely because of their race. Only if the prosecutor could then show nonracial grounds for the strikes would no Sixth Amendment violation be found.

We reject petitioner's fundamental thesis that a prosecutor's use of peremptory challenges to eliminate a distinctive group in the community deprives the defendant of a Sixth Amendment right to the "fair possibility" of a representative jury. While statements in our prior cases have alluded to such a "fair possibility" requirement, satisfying it has not been held to require anything beyond the inclusion of all cognizable groups in the venire, see *Lockhart* v. *McCree*, 476 U. S. 162 (1986); *Duren, supra; Taylor, supra,* and the use of a jury numbering at least six persons, see *Ballew* v. *Georgia,* 435 U. S. 223 (1978); *Williams* v. *Florida,* 399 U. S. 78 (1970). A prohibition upon the exclusion of cognizable groups through peremptory challenges has no conceivable basis in the text of the Sixth Amendment, is without support in our prior decisions, and would undermine rather than further the constitutional guarantee of an impartial jury.

It has long been established that racial groups cannot be excluded from the venire from which a jury is selected. That constitutional principle was first set forth not under the Sixth Amendment but under the Equal Protection Clause.

*Strauder* v. *West Virginia*, 100 U. S. 303 (1880). In that context, the object of the principle and the reach of its logic are not established by our common-law traditions of jury trial, but by the Fourteenth Amendment's prohibition of unequal treatment in general and racial discrimination in particular. That prohibition therefore has equal application at the petit jury and the venire stages, as our cases have long recognized. Thus, in a decision rendered only 12 years after the Fourteenth Amendment was enacted, striking down a West Virginia law that excluded blacks from jury service, we said:

> "[I]t is hard to see why the statute of West Virginia should not be regarded as discriminating against a colored man when he is put upon trial for an alleged criminal offence against the State. It is not easy to comprehend how it can be said that while every white man is entitled to a trial by a jury selected from persons of his own race or color, or, rather, selected without discrimination against his color, and a negro is not, the latter is equally protected by the law with the former. Is not protection of life and liberty against race or color prejudice, a right, a legal right, under the constitutional amendment? And how can it be maintained that compelling a colored man to submit to a trial for his life by a jury drawn from a panel from which the State has expressly excluded every man of his race, because of color alone, however well qualified in other respects, is not a denial to him of equal legal protection?" *Strauder*, *supra*, at 309.

Four Terms ago, in *Batson*, we squarely held that race-based exclusion is no more permissible at the individual petit jury stage than at the venire stage—not because the two stages are inseparably linked, but because the intransigent prohibition of racial discrimination contained in the Fourteenth Amendment applies to both of them.

Our relatively recent cases, beginning with *Taylor* v. *Louisiana*, hold that a fair-cross-section venire requirement is imposed by the Sixth Amendment, which provides in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ." The fair-cross-section venire requirement is obviously not explicit in this text, but is derived from the traditional understanding of how an "impartial jury" is assembled. That traditional understanding includes a representative venire, so that the jury will be, as we have said, "drawn *from* a fair cross section of the community," *Taylor*, 419 U. S., at 527 (emphasis added). But it has never included the notion that, in the process of drawing the jury, that initial representativeness cannot be diminished by allowing both the accused and the State to eliminate persons thought to be inclined against their interests—which is precisely how the traditional peremptory-challenge system operates. As we described that system in *Swain* v. *Alabama.* 380 U. S. 202 (1965):

> "[The peremptory challenge] is often exercised . . . on grounds normally thought irrelevant to legal proceedings or official action, namely, the race, religion, nationality, occupation or affiliations of people summoned for jury duty. For the question a prosecutor or defense counsel must decide is not whether a juror of a particular race or nationality is in fact partial, but whether one from a different group is less likely to be." *Id.*, at 220–221 (citation and footnote omitted).

The Sixth Amendment requirement of a fair cross section on the venire is a means of assuring, not a *representative* jury (which the Constitution does not demand), but an *impartial* one (which it does). Without that requirement, the State could draw up jury lists in such manner as to produce a pool of prospective jurors disproportionately ill disposed towards one or all classes of defendants, and thus more likely to yield

petit juries with similar disposition. The State would have, in effect, unlimited peremptory challenges to compose the pool in its favor. The fair-cross-section venire requirement assures, in other words, that in the process of selecting the petit jury the prosecution and defense will compete on an equal basis.

But to say that the Sixth Amendment deprives the State of the ability to "stack the deck" in its favor is not to say that each side may not, once a fair hand is dealt, use peremptory challenges to eliminate prospective jurors belonging to groups it believes would unduly favor the other side. Any theory of the Sixth Amendment leading to that result is implausible. The tradition of peremptory challenges for both the prosecution and the accused was already venerable at the time of Blackstone, see 4 W. Blackstone, Commentaries 346–348 (1769), was reflected in a federal statute enacted by the same Congress that proposed the Bill of Rights, see Act of Apr. 30, 1790, ch. 9, § 30, 1 Stat. 119, was recognized in an opinion by Justice Story to be part of the common law of the United States, see *United States* v. *Marchant*, 12 Wheat. 480, 483–484 (1827), and has endured through two centuries in all the States, see *Swain, supra,* at 215–217. The constitutional phrase "impartial jury" must surely take its content from this unbroken tradition.[1] One could plausibly

---

[1] JUSTICE STEVENS asserts that our "historical claims are significantly overstated," and that we "will have to do better than Blackstone and the 1790 Congress" for support. *Post,* at 518, n. 15. As to the former, he quotes "[w]hat Blackstone actually said"—namely, that the King had no peremptory challenges but only challenges for cause. *Ibid.* But JUSTICE STEVENS' quotation should have continued to the next two sentences of what Blackstone actually said: "However it is held, that the king need not assign his cause of challenge, till all the panel is gone through, and unless there cannot be a full jury without the persons so challenged. And then, and not sooner, the king's counsel must shew the cause: otherwise the juror shall be sworn." 4 W. Blackstone, Commentaries 347 (1769).

The 1790 legislation provided that if, in a treason or capital prosecution, the defendant should refuse to plead, or should repeatedly exercise pe-

argue (though we have said the contrary, see *Stilson* v. *United States*, 250 U. S. 583, 586 (1919)) that the requirement of an "impartial jury" impliedly *compels* peremptory challenges, but in no way could it be interpreted directly or indirectly to prohibit them. We have gone out of our way to make this clear in our opinions. In *Lockhart*, we said: "We have never invoked the fair-cross-section principle to invali-

---

remptory challenges past a certain number (35 for treason, 20 for other capital cases), "the court . . . shall notwithstanding proceed to . . . trial . . . as if [the defendant] had pleaded not guilty." 1 Stat. 119. The statute's relevance to the present inquiry is that it constitutes acknowledgment of the common-law practice of peremptory challenge, a practice that unquestionably extended to defense and prosecution alike. The Supreme Court decision cited in text, *United States* v. *Marchant*, 12 Wheat. 480 (1827), specifically interpreted the Act to permit "[t]he acknowledged right of peremptory challenge existing *in the crown* before the statute of 33 Edw. I., and the uniform practice which has prevailed since that statute," *id.*, at 484 (emphasis added). JUSTICE STEVENS relies upon a later case, *United States* v. *Shackleford*, 18 How. 588, 590 (1856), which said that the 1790 Act does not demand that prosecutorial peremptory challenges remain available in all federal courts despite the Act of July 20, 1840, 5 Stat. 394, which required peremptory challenges to conform with state law. This entirely misses our point — which is not that the 1790 Act made the prosecutor's peremptory challenge a part of federal statutory law, but merely that (as *Marchant* held) it acknowledged the prosecutor's peremptory challenge to be part of the well-established common law that formed the background of the Sixth Amendment. Far from refuting this, *Shackleford* reinforces it, referring to the "qualified right [of peremptory challenge], existing at common law, by the government." 18 How., at 590.

JUSTICE STEVENS contends that the historical record is in any event of not much importance to the question before us, since "[t]he Court has forsworn reliance on venerable history to give meaning to the Sixth Amendment's numerosity and unanimity requirements," and so should not rely upon it here either. *Post*, at 518. We have certainly held that a *departure* from historical practice regarding number and unanimity of jurors does not necessarily deny the right of jury trial. But that is quite different from saying that *adherence* to historical practice can deny the right of jury trial. Under a historically unencumbered Sixth Amendment of the sort JUSTICE STEVENS apparently envisions, it would be conceivable that a 12-person or a unanimous jury is unconstitutional.

date the use of either for-cause or peremptory challenges to prospective jurors, or to require petit juries, as opposed to jury panels or venires, to reflect the composition of the community at large." 476 U. S., at 173. In *Taylor*, we "emphasized that in holding that petit juries must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition." 419 U. S., at 538. Accord, *Duren* v. *Missouri*, 439 U. S., at 363–364, and n. 20.

The fundamental principle underlying today's decision is the same principle that underlay *Lockhart*, which rejected the claim that allowing challenge for cause, in the guilt phase of a capital trial, to jurors unalterably opposed to the death penalty (so-called "*Witherspoon*-excludables") violates the fair-cross-section requirement. It does not violate that requirement, we said, to disqualify a group for a reason that is related "to the ability of members of the group to serve as jurors *in a particular case.*" 476 U. S., at 175 (emphasis added). The "representativeness" constitutionally required at the venire stage can be disrupted at the jury-panel stage to serve a State's "legitimate interest." *Ibid.* In *Lockhart* the legitimate interest was "obtaining a single jury that can properly and impartially apply the law to the facts of the case at both the guilt and sentencing phases of a capital trial." *Id.*, at 175–176. Here the legitimate interest is the assurance of impartiality that the system of peremptory challenges has traditionally provided.

The rule we announce today is not only the only plausible reading of the text of the Sixth Amendment, but we think it best furthers the Amendment's central purpose as well. Although the constitutional guarantee runs only to the individual and not to the State, the goal it expresses is jury impartiality with respect to both contestants: neither the defendant nor the State should be favored. This goal, it seems to us,

would positively be obstructed by a petit jury cross-section requirement which, as we have described, would cripple the device of peremptory challenge. We have acknowledged that that device occupies "an important position in our trial procedures," *Batson*, 476 U. S., at 98, and has indeed been considered "a necessary part of trial by jury," *Swain* v. *Alabama*, 380 U. S., at 219. Peremptory challenges, by enabling each side to exclude those jurors it believes will be most partial toward the other side, are a means of "eliminat-[ing] extremes of partiality on both sides," *ibid.*, thereby "assuring the selection of a qualified *and unbiased* jury," *Batson, supra,* at 91 (emphasis added).[2]

Petitioner seeks to minimize the harm that recognition of his claim would cause to the peremptory challenge system by assuring us that the striking of identifiable community groups other than blacks need not be accorded similar treatment. That is a comforting assurance, but the theory of petitioner's case is not compatible with it. If the goal of the Sixth Amendment is representation of a fair cross section of the community on the petit jury, then intentionally using peremptory challenges to exclude *any* identifiable group should be impermissible—which would, as we said in *Lockhart*, "likely require the elimination of peremptory challenges." 476 U. S., at 178.

JUSTICE MARSHALL argues that prohibiting purposeful peremptory challenge of members of distinctive groups "would leave the peremptory challenge system almost entirely untouched" because the Court is unlikely to recognize many groups as "distinctive." *Post*, at 502. Misplaced optimism on this subject is cost free to those who in any event "would

---

[2] JUSTICE STEVENS states that a prosecutor's "assumption that a black juror may be presumed to be partial simply because he is black . . . is impermissible since *Batson.*" *Post*, at 519. It is undoubtedly true that, since *Batson*, such an assumption violates the Equal Protection Clause. That has nothing to do with whether it (and, necessarily, many other group-based assumptions) violates the Sixth Amendment.

. . . eliminat[e] peremptory challenges entirely in criminal cases," *Batson, supra* at 107 (MARSHALL, J., concurring), but we see no justification for indulging it. To support his prediction, JUSTICE MARSHALL states that the only groups the Court has recognized as distinctive thus far have been women and certain racial groups, *post*, at 502 (citing *Lockhart*, 476 U. S., at 175). That is true enough, but inasmuch as those groups happen to constitute *all* the groups we have considered in the venire context, what it demonstrates is not how difficult it is to meet our standards for distinctiveness, but how few groups are systematically excluded from the venire. As we have discussed, however, many groups are regularly excluded from the petit jury through peremptory challenge. *Lockhart* itself suggests, quite rightly, that even so exotic a group as "*Witherspoon*-excludables" would be a distinctive group whose rejection at the venire stage would violate the Sixth Amendment. 476 U. S., at 176. If, as JUSTICE MARSHALL would have it, rejection at the venire stage and rejection at the panel stage are one and the same, there is every reason to believe that many commonly exercised bases for peremptory challenge would be rendered unavailable.

Dispassionate analysis does not bear out JUSTICE MARSHALL's contentions that we have "ignor[ed] precedent after precedent," *post*, at 503, "reject[ed] . . . the principles underlying a whole line of cases," *ibid.*, and suffer from "selective amnesia with respect to our cases in this area," *post*, at 500. His dissent acknowledges that the fair-cross-section decisions it discusses — *Taylor, Duren,* and *Lockhart* — "referr[ed] to exclusion of prospective jurors from venires, not their exclusion from petit juries by means of peremptory challenges," *post*, at 496. It nonetheless counts those cases as "well-grounded precedents," *post*, at 490, because "the particular context does not affect the analysis," *post*, at 496. That may be the dissent's view, but it was assuredly not the view expressed in the cases themselves. As noted earlier, *all three*

*of those opinions* specifically disclaimed application of their analysis to the petit jury. See *supra*, at 482–483. Last Term, in *Teague* v. *Lane*, 489 U. S. 288 (1989), we were asked to decide the very same question we decide today— "whether," as JUSTICE O'CONNOR's plurality opinion put it, "the Sixth Amendment's fair cross section requirement should now be extended to the petit jury." *Id.*, at 292. We did not reach that question because the four-Justice plurality, with JUSTICE WHITE agreeing as to the result, held that "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced," *id.*, at 310, and found that in asserting a fair-cross-section requirement at the petit jury stage petitioner was urging adoption of such a "new rule," *id.*, at 301—that is, a rule producing a result "not *dictated* by [prior] precedent," *ibid.* (emphasis in original). Though there were four Justices in dissent, only two of them expressed the view that a petit jury fair-cross-section requirement *was* compelled by prior precedent. See *id.*, at 340–344 (BRENNAN, J., dissenting). In short, there is no substance to the contention that what we hold today "ignor[es] precedent after precedent."

JUSTICE MARSHALL's dissent rolls out the ultimate weapon, the accusation of insensitivity to racial discrimination—which will lose its intimidating effect if it continues to be fired so randomly. It is not remotely true that our opinion today "lightly . . . set[s] aside" the constitutional goal of "eliminat[ing] racial discrimination in our system of criminal justice." *Post*, at 503–504. The defendant in this case is not a black man, but a convicted white rapist who seeks to use the striking of blacks from his jury to overturn his conviction. His Sixth Amendment claim would be just as strong if the object of the exclusion had been, not blacks, but postmen, or lawyers, or clergymen, or any number of other identifiable groups. Race as such has nothing to do with the legal issue in this case. We do not hold that the systematic exclusion of

blacks from the jury system through peremptory challenges is lawful; it obviously is not, see *Batson, supra.* We do not even hold that the exclusion of blacks through peremptory challenges in this particular trial was lawful. Nor do we even hold that this particular (white) defendant does not have a valid constitutional challenge to such racial exclusion.[3] All we hold is that he does not have a valid constitutional challenge *based on the Sixth Amendment*—which no more forbids the prosecutor to strike jurors on the basis of race than it forbids him to strike them on the basis of innumerable other generalized characteristics.

To be sure, as JUSTICE MARSHALL says, the Sixth Amendment sometimes operates "as a weapon to combat racial discrimination," *post,* at 504, n. 2—just as statutes against murder sometimes operate that way. But it is no more reasonable to portray this as a civil rights case than it is to characterize a proposal for increased murder penalties as an antidiscrimination law. Since *only* the Sixth Amendment claim, and not the equal protection claim, is at issue, the question before us is not whether the defendant has been unlawfully discriminated against because he was white, or whether the excluded jurors have been unlawfully discrimi-

---

[3] As noted at the outset, petitioner did not seek review of the denial of his Equal Protection Clause claim. Our grant of certiorari was limited to the Sixth Amendment question, and the equal protection question has been neither briefed nor argued.

JUSTICE STEVENS' contention that the equal protection question should nonetheless be decided, *post,* at 506–507, contradicts this Court's Rule 14.1(a), which states: "Only the questions set forth in the petition, or fairly included therein, will be considered by the Court." It is almost unprecedented to accept certiorari on a question involving one constitutional provision and then to decide the case under a different constitutional provision neither presented, briefed, nor argued. The exception was *Batson,* where, as accurately described in Chief Justice Burger's dissent, "the Court depart[ed] dramatically from its normal procedure without any explanation." 476 U. S., at 115. JUSTICE STEVENS asserts that *Batson* "makes it appropriate" to reach the equal protection claim here, *post,* at 507. We decline to convert *Batson* from an unexplained departure to an unexplained rule.

nated against because they were black, but whether the defendant has been denied the right to "trial . . . by an impartial jury." The earnestness of this Court's commitment to racial justice is not to be measured by its willingness to expand constitutional provisions designed for other purposes beyond their proper bounds.

The judgment of the Illinois Supreme Court is

*Affirmed.*

JUSTICE KENNEDY, concurring.

I join JUSTICE SCALIA's opinion and agree with him that we must reject petitioner's claim that the fair-cross-section requirement under the Sixth Amendment was violated. The contention is not supported by our precedents and admits of no limiting principle to make it workable in practice. I write this separate concurrence to note that our disposition of the Sixth Amendment claim does not alter what I think to be the established rule, which is that exclusion of a juror on the basis of race, whether or not by use of a peremptory challenge, is a violation of the juror's constitutional rights. *Batson* v. *Kentucky*, 476 U. S. 79 (1986). I agree with JUSTICE MARSHALL, *post*, at 490–491, that this case does not resolve the question whether a defendant of a race different from that of the juror may challenge the race-motivated exclusion of jurors under the constitutional principles that underpin *Batson*. Like JUSTICE MARSHALL, I find it essential to make clear that if the claim here were based on the Fourteenth Amendment Equal Protection Clause, it would have merit.

Many of the concerns expressed in *Batson*, a case where a black defendant objected to the exclusion of black jurors, support as well an equal protection claim by a defendant whose race or ethnicity is different from the dismissed juror's. To bar the claim whenever the defendant's race is not the same as the juror's would be to concede that racial exclusion of citizens from the duty, and honor, of jury service will

be tolerated, or even condoned. We cannot permit even the inference that this principle will be accepted, for it is inconsistent with the equal participation in civic life that the Fourteenth Amendment guarantees. I see no obvious reason to conclude that a defendant's race should deprive him of standing in his own trial to vindicate his own jurors' right to sit. As JUSTICE MARSHALL states, *Batson* is based in large part on the right to be tried by a jury whose members are selected by nondiscriminatory criteria and on the need to preserve public confidence in the jury system. These are not values shared only by those of a particular color; they are important to all criminal defendants.

Support can be drawn also from our established rules of standing, given the premise that a juror's right to equal protection is violated when he is excluded because of his race. See *Batson, supra,* at 87. Individual jurors subjected to peremptory racial exclusion have the legal right to bring suit on their own behalf, *Carter* v. *Jury Comm'n of Greene County,* 396 U. S. 320 (1970), but as a practical matter this sort of challenge is most unlikely. The reality is that a juror dismissed because of his race will leave the courtroom with a lasting sense of exclusion from the experience of jury participation, but possessing little incentive or resources to set in motion the arduous process needed to vindicate his own rights. We have noted that a substantial relation may entitle one party to raise the rights of another. See *Singleton* v. *Wulff,* 428 U. S. 106, 114–115 (1976). An important bond of this type links the accused and an excluded juror. In sum, the availability of a Fourteenth Amendment claim by a defendant not of the same race as the excluded juror is foreclosed neither by today's decision nor by *Batson.*

*Batson* did contain language indicating that the peremptory challenge of jurors of the same race as the defendant presents a different situation from the peremptory challenge of jurors of another race, but I consider the significance of the discussion to be procedural. An explicit part of the eviden-

tiary scheme adopted in *Batson* was the defendant's showing that he was a member of a "cognizable racial group," and that the excluded juror was a member of the same group. See 476 U. S., at 96–98. The structure of this scheme rests upon grounds for suspicion where the prosecutor uses his strikes to exclude jurors whose only connection with the defendant is the irrelevant factor of race. It is reasonable in this context to suspect the presence of an illicit motivation, the "belief that blacks could not fairly try a black defendant." *Id.*, at 101 (WHITE, J., concurring). Where this obvious ground for suspicion is absent, different methods of proof may be appropriate.

With these observations touching upon the matters raised in JUSTICE MARSHALL's dissent, I concur in the opinion of the Court.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN and JUSTICE BLACKMUN join, dissenting.

The Court decides today that a prosecutor's racially motivated exclusion of Afro-Americans from the petit jury does not violate the fair-cross-section requirement of the Sixth Amendment. To reach this startling result, the majority misrepresents the values underlying the fair-cross-section requirement, overstates the difficulties associated with the elimination of racial discrimination in jury selection, and ignores the clear import of well-grounded precedents. I dissent.

I

Before proceeding to what the Court does decide, I pause to note what it does not. For reasons that are not immediately apparent, petitioner expressly disavows the argument that a white defendant has standing to raise an equal protection challenge, based on our decision in *Batson* v. *Kentucky*, 476 U. S. 79 (1986), to a prosecutor's racially motivated peremptory strikes of Afro-American venirepersons. See Brief for Petitioner 6, 17; Reply Brief for Petitioner 2; Tr. of

Oral Arg. 21–23.   Our grant of certiorari did not encompass the question whether a white defendant has standing to make a *Batson* claim, see Pet. for Cert. 1; and the parties did not brief the question; it is therefore not before us today.   Recognizing this, the majority explicitly leaves open the question whether a white defendant is without standing to make such a claim.   See *ante,* at 487.   Another of the majority's statements, however, could be read to prefigure how the Court would resolve that question if faced with it.   See *ante,* at 477 (implying "a requirement of correlation between the group identification of the defendant and the group identification of excluded venire members" for standing to raise the equal protection claim).   It is important, therefore, briefly to examine the *Batson* question.

As a majority of this Court has now concluded, a close reading of *Batson* shows that a defendant's race is irrelevant to his standing to raise the equal protection claim recognized in that case.   See *infra* this page and 492; *ante,* at 488–490 (KENNEDY, J., concurring); *post,* at 505–508 (STEVENS, J., dissenting).   Because Batson was Afro-American, it is not surprising that the Court held that he could make out a prima facie case of an equal protection violation by showing, *inter alia,* that "the prosecutor ha[d] exercised peremptory challenges to remove from the venire members of the defendant's race."   476 U. S., at 96.   Nowhere did the Court state, however, that a white defendant could not make out a prima facie case based upon the exclusion of Afro-American jurors, and the logic of the Court's decision would not have supported such a conclusion.

The fundamental principle undergirding the decision in *Batson* was that "a 'State's purposeful or deliberate denial to Negroes on account of race of participation as jurors in the administration of justice violates the Equal Protection Clause.'"   *Id.,* at 84 (quoting *Swain* v. *Alabama,* 380 U. S. 202, 203–204 (1965)).   This principle, Justice Powell explained for the Court, has three bases: the right of the de-

fendant "to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria," 476 U. S., at 85–86 (citing *Martin* v. *Texas*, 200 U. S. 316, 321 (1906), and *Ex parte Virginia*, 100 U. S. 339, 345 (1880)); the right of a member of the community not to be assumed incompetent for and be excluded from jury service on account of his race, 476 U. S., at 87 (citing *Strauder* v. *West Virginia*, 100 U. S. 303, 308 (1880), *Carter* v. *Jury Comm'n of Greene County*, 396 U. S. 320, 329–330 (1970), and *Neal* v. *Delaware*, 103 U. S. 370, 386 (1881)); and the need to preserve "public confidence in the fairness of our system of justice," 476 U. S., at 87 (citing *Strauder, supra,* at 308, *Ballard* v. *United States*, 329 U. S. 187, 195 (1946), and *McCray* v. *New York*, 461 U. S. 961, 968 (1983) (MARSHALL, J., dissenting from denial of certiorari)). Although the majority implies that a defendant has a greater Fourteenth Amendment interest in being tried by a jury from which members of his race (as opposed to people of other races) have not been excluded, *ante,* at 476–477, I do not read the majority to suggest that a defendant of a race different from that of the people excluded has *no* interest in the racial composition of his jury. More fundamentally, Batson was permitted to raise not only his rights, but also those of the members of the venire and of the general public. If Batson could do so, there is no reason a white defendant cannot do so as well.

In any event, the question whether a defendant's race affects his standing to invoke *Batson* is one on which the Court has not ruled. For the reader who seeks guidance on how the Court would rule if the issue were presented and argued, the agreement of five Justices that a defendant's race is irrelevant to the Fourteenth Amendment standing inquiry is far more illuminating than the majority's veiled intimations and cryptic turns of phrase.

## II

The issue that *is* presented and decided today is whether a prosecutor's exercise of peremptory challenges for the sole

purpose of excluding Afro-Americans from a petit jury contravenes the Sixth Amendment.  I think that it does.

The fundamental premise underlying the majority's analysis in this case is the assertion that the sole purpose of the Sixth Amendment's jury trial requirement is to secure for the defendant an impartial jury.  The majority defends this thesis by constructing a false dichotomy: the fair-cross-section requirement *either* protects impartiality *or* guarantees a petit jury that mirrors the community from which it is drawn.  From these two options, the majority selects impartiality as its governing principle.  See *ante*, at 480 ("The Sixth Amendment requirement of fair cross section on the venire is a means of assuring, not a *representative* jury (which the Constitution does not demand), but an *impartial* one (which it does)").  The remainder of its analysis proceeds from and is dependent upon the assumption that impartiality is the sole end of the fair-cross-section requirement.  That assumption is flatly false, and the conclusion to which it leads is one that I cannot imagine that even the majority would accept in all its implications.[1]

## A

The Sixth Amendment guarantees criminal defendants the right to a trial "by an impartial jury."  Obviously, then, impartiality is one concern addressed by the Amendment. Just as self-evident is the proposition that a criminal defendant is entitled to have his case decided by a "jury."  We have made clear that "jury" is a term of art, and that a body of people assembled to decide a case must meet certain constitutional minimums before it qualifies as a "jury" in the constitutional sense.  See, *e. g.*, *Ballew* v. *Georgia*, 435 U. S. 223 (1978) (holding, without relying on the impartiality require-

---

[1] Indeed, as JUSTICE STEVENS has persuasively shown, *post*, at 508–520 (dissenting opinion), even if impartiality were the only goal the fair-cross-section requirement is designed to serve, peremptory exclusion of Afro-American jurors on account of their race makes a truly impartial jury impossible to achieve and thus violates the Sixth Amendment.

ment, that a five-person "jury" is insufficient to satisfy Constitution's demand of a "jury" trial).   Contrary to the majority's implication, the fair-cross-section requirement is not based on the constitutional demand for impartiality; it is founded on the notion that what is denominated a "jury" is not a "jury" in the eyes of the Constitution unless it is drawn from a fair cross section of the community.

Thus, in *Taylor* v. *Louisiana*, 419 U. S. 522, 527 (1975), we stated:

> "[T]he Court has unambiguously declared that the American concept of the jury trial contemplates a jury drawn from a fair cross section of the community.   A unanimous Court stated in *Smith* v. *Texas*, 311 U. S. 128, 130 (1940), that '[i]t is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community.'   To exclude racial groups from jury service was said to be 'at war with our basic concepts of a democratic society and a representative government.'"

Indeed, we recognized in *Taylor* that the fair-cross-section requirement and the impartiality requirement provide distinct protections, and that the Sixth Amendment guarantees both.   *Id.*, at 536 (acknowledging the "Sixth Amendment right to trial by an impartial jury drawn from a fair cross section of the community").

That the two protections are distinct is shown as well by *Duren* v. *Missouri*, 439 U. S. 357 (1979), where we reaffirmed *Taylor* in holding that a state law permitting women, but not men, to opt out of jury service violated the fair-cross-section requirement.   Duren did not contend that any juror was biased against him.   Rather, he claimed that his right to a jury trial was violated by the *de facto* exclusion of women from his venire.   Only the dissent in *Duren* suggested that the Sixth Amendment serves nothing but impartiality.   439 U. S., at 370–371, and n. (opinion of REHNQUIST, J.).

More recently, in *Lockhart* v. *McCree*, 476 U. S. 162 (1986), the Court, in an opinion written by JUSTICE REHN-QUIST, again confirmed that the fair-cross-section require-ment and the impartiality requirement are different consti-tutional mandates serving different purposes. The Court therefore analyzed the two requirements separately, never suggesting that its resolution of the impartiality question in any way affected its resolution of the fair-cross-section issue. Compare *id.*, at 174–177 (class of prospective jurors unalter-ably opposed to the death penalty does not constitute "dis-tinctive group" for purposes of the fair-cross-section require-ment), with *id.*, at 177–184 (rejecting "alternative" argument that resulting jury was "slanted" in favor of a guilty verdict in violation of impartiality requirement).

## B

Our precedents thus belie the majority's assertion that the fair-cross-section requirement is merely "a means of assur-ing" impartiality. *Ante,* at 480. Rather, the fair-cross-section requirement serves entirely different purposes. In *Lockhart,* the Court identified these purposes as "(1) 'guard-[ing] against the exercise of arbitrary power' and ensuring that the 'commonsense judgment of the community' will act as 'a hedge against the overzealous or mistaken prosecutor,' (2) preserving 'public confidence in the fairness of the crimi-nal justice system,' and (3) implementing our belief that 'sharing in the administration of justice is a phase of civic responsibility.'" 476 U. S., at 174–175 (quoting *Taylor, supra,* at 530–531).

Had the majority in this case acknowledged that the fair-cross-section requirement serves these purposes, it would have been hard pressed to deny that the exclusion of Afro-Americans from petit juries on the basis of their race violates the Sixth Amendment. Indeed, in *Lockhart* itself, the Court noted that the exclusion of

"such groups as blacks, . . . women, . . . and Mexican-Americans . . . from jury service clearly contravene[s] all three of the aforementioned purposes of the fair-cross-section requirement. Because these groups [are] excluded for reasons completely unrelated to the ability of members of the group to serve as jurors in a particular case, the exclusion raise[s] at least the possibility that the composition of juries would be arbitrarily skewed in such a way as to deny criminal defendants the benefit of the common-sense judgment of the community. In addition, the exclusion from jury service of large groups of individuals not on the basis of their inability to serve as jurors, but on the basis of some immutable characteristic such as race, gender, or ethnic background, undeniably [gives] rise to an 'appearance of unfairness.' Finally, such exclusion improperly deprive[s] members of these often historically disadvantaged groups of their right as citizens to serve on juries in criminal cases." 476 U. S., at 175 (citations omitted).

To be sure, the Court was referring to exclusion of prospective jurors from venires, not their exclusion from petit juries by means of peremptory challenges. But the particular context does not affect the analysis. A defendant's interest in obtaining the "commonsense judgment of the community" is impaired by the exclusion from his jury of a significant segment of the community; whether the exclusion is accomplished in the selection of the venire or by peremptory challenge is immaterial. *Batson* v. *Kentucky*, 476 U. S., at 86. A prosecutor's race-based peremptory challenge of all Afro-American venirepersons, no less than a State's exclusion of Afro-Americans from the venire, destroys even the possibility that this distinctive group will be represented on the defendant's petit jury.

Likewise, the second purpose animating the fair-cross-section requirement—preserving public confidence in the fairness of our criminal justice system—applies equally to the

selection of the petit jury as to the selection of the venire. Racially motivated peremptory challenges are as destructive of the public's perception that our system of criminal justice is fair as are exclusions of certain racial groups from the venire. *Id.*, at 87–88.

Finally, the goal of ensuring that no distinctive group be excluded from full participation in our criminal justice system is impaired when the prosecutor implies, through the use of racially motivated peremptory challenges, that he does not trust Afro-Americans to be fair enough or intelligent enough to serve on the case he is trying. *Id.*, at 87. That the juror may eventually be seated on a jury in another case is immaterial; no one can be expected to perceive himself to be a full participant in our system of criminal justice, or in our society as a whole, when he is told by a representative of the government that, because of his race, he is too stupid or too biased to serve on a particular jury. That he might not have to suffer such an indignity in *every* case is not an answer to the injury inflicted by the one instance of racism he is forced to endure.

Thus, no rational distinction can be drawn in the context of our fair-cross-section jurisprudence between the claims we accepted in *Taylor* and *Duren* and the claim at issue here. The majority avoids reaching this conclusion only by the expedient of ignoring the clear import of our cases. It justifies its refusal to confront the logic underlying those cases by suggesting that *"all three of those opinions [Taylor, Duren,* and *Lockhart]* specifically disclaimed application of their analysis to the petit jury." *Ante,* at 485–486. The majority's semantic games aside, these cases do not suggest that fair-cross-section principles are inapplicable to the petit jury; the cases simply recognize that those principles do not mandate a petit jury that mirrors the population of distinctive groups in the community. See *Taylor, supra,* at 538 ("[W]e impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive

groups in the population"); *Duren,* 439 U. S., at 364, n. 20 (the fair-cross-section "requirement does not mean 'that petit juries actually chosen must mirror the community'") (quoting *Taylor, supra,* at 538); *Lockhart, supra,* at 173 (Court has not required that petit juries "reflect the composition of the community at large"). Indeed, while the *Lockhart* Court noted that we have not in the past "invoked the fair-cross-section principle to invalidate the use of either for-cause or peremptory challenges," *ibid.,* it also recognized that we have applied that principle to the petit jury in holding unconstitutional petit juries of fewer than six members on the ground that smaller juries do not "'truly represen[t] their communities,'" *id.,* at 173, n. 14 (quoting *Ballew,* 435 U. S., at 239).

A "[d]ispassionate analysis" of our cases, *ante,* at 485, thus makes clear that fair-cross-section principles *do* apply to the petit jury. Moreover, I have shown, *supra,* at 495–498, and the majority does not attempt to deny, that when analyzed in terms of those principles, petitioner's claim is clearly meritorious. The conclusion the majority reaches thus rests entirely on its refusal to apply those principles to this case. So far as I can discern, that refusal, in turn, rests entirely on a claim the majority presents almost as an afterthought—that acceptance of Holland's argument would be the first step down a slippery slope leading to a criminal justice system in which trial judges would be required to engineer each jury to reflect, in its few members, all of the myriad demographic groups of which American society is composed. See, *e. g., ante,* at 482–483, 484. Of course, as the majority is forced to admit, *ante,* at 484, petitioner disclaims any argument that such a regime is constitutionally compelled, or even possible. Thus, the majority is not frightened by petitioner's argument, but by the consequences that the majority fancies would flow from our acceptance of that argument.

The majority's apparent concern that applying the fair-cross-section requirement to the petit jury would, as a logical

matter, require recognition of a right to a jury that mirrors the population of distinctive groups in the community is chimerical. Although the purposes of the fair-cross-section requirement cannot be served unless prosecutors are precluded from exercising racially motivated peremptory challenges of prospective jurors, see *supra*, at 494–498, those purposes do not support an argument for any more than a fair possibility that the petit jury will reflect the population of Afro-Americans (or of any other distinctive group). They do not support, in other words, the claim that any particular jury must comprise some specific number of members of each distinctive group. Only if prospective jurors are purposely excluded on account of their membership in a distinctive group—whether in the selection of the venire or in the prosecutor's exercise of peremptory challenges—is the defendant denied the possibility of a fair cross section of the community.

It is arguably true that the first purpose underlying the fair-cross-section requirement—the defendant's interest in obtaining the commonsense judgment of the community—would be served by a requirement that all distinctive groups in the community be represented on each petit jury. But see *post*, at 512, and n. 10 (STEVENS, J., dissenting) (showing that representative jury requirement might well *interfere* with a jury's expression of the commonsense judgment of the community). *Lockhart*'s second and third purposes, however, do not support such a requirement. The public is unlikely to perceive that our system of criminal justice is unfair simply because a particular jury does not represent every segment of the community, especially where the jury's composition is merely the result of a spin of the jury wheel. Public confidence is undermined by the appearance that the government is trying to stack the deck against criminal defendants and to remove Afro-Americans from jury service solely because of their race. No similar inference can be drawn from the operations of chance. Similarly, the fair-cross-section requirement's goal of ensuring that each dis-

tinctive group be a full participant in our system of criminal justice is simply not impaired when a juror is seated, by the luck of the draw, on one panel instead of on another.

Finally, this Court's refusal to read the fair-cross-section requirement as mandating a petit jury representing all of the community's distinctive groups is born not of principle, but of necessity, of the recognition that no such requirement could as a practical matter be enforced. As the Court stated in *Lockhart*, "[t]he limited scope of the fair-cross-section requirement is a direct and inevitable consequence of the practical impossibility of providing each criminal defendant with a truly 'representative' petit jury." 476 U. S., at 173–174 (citing *Batson* v. *Kentucky*, 476 U. S., at 85–86, n. 6).

As we demonstrated in deciding *Batson*, however, it is emphatically *not* impossible to prohibit prosecutors from excluding Afro-American jurors on account of their race, and the majority does not suggest that such a prohibition would be more difficult to enforce in the circumstances presented by this case. To the extent that the limitations on the reach of the fair-cross-section requirement are those of feasibility, then, the Court's result in this case is indefensible.

Rather than join issue on the real arguments presented by this case—whether the several purposes served by the fair-cross-section requirement do or do not dictate that it apply in these circumstances—the majority seeks to avoid the issue by acting as if impartiality were the only goal of our fair-cross-section cases, despite this Court's repeated and explicit statements that such is not the case. In so doing, the majority glosses over not only a few, but quite literally *every single* fair-cross-section case that this Court has decided.

## C

If the majority's selective amnesia with respect to our cases in this area is surprising, its suggestion that recognition of petitioner's Sixth Amendment claim "would cripple the device of peremptory challenge," *ante*, at 484, can only be

described as staggering. The majority suggests that (1) the peremptory challenge system is "venerable" and essential to jury impartiality, *ante*, at 481–482; (2) limitations on a prosecutor's power peremptorily to challenge jurors on *any* basis, including race, would effectively destroy that system, *ante*, at 483–485; and (3) the Sixth Amendment is therefore not implicated by racially motivated peremptory exclusions, *ante*, at 483, 487. Each step in the majority's logic is plainly fallacious.

First, as even the majority admits, *ante*, at 481–482, this Court has repeatedly recognized that a State need not permit peremptory challenges. See, *e. g.*, *Stilson* v. *United States*, 250 U. S. 583, 586 (1919). It is difficult to reconcile that holding with the notion that peremptory challenges are somehow essential to an impartial jury, the right to which *is* constitutionally protected. That "[o]ne could plausibly argue" that the peremptory challenge system is constitutionally compelled, *ante*, at 481, is hardly an answer to the contrary statements in our cases. Plausible arguments can be made for many erroneous propositions, but that does not make them any less wrong. Moreover, JUSTICE STEVENS clearly demonstrates that invocations of our "venerable" peremptory challenge system are insufficient to defeat Holland's claims. See *post*, at 517–518, and n. 15.

In support of the second step in its analysis, the majority quotes *Swain* v. *Alabama*, 380 U. S. 202, 219 (1965), for the proposition that even racially motivated peremptory challenges are essential to eliminate "'extremes of partiality on both sides.'" *Ante*, at 484. What the majority neglects to mention is that *Batson*, in overruling *Swain* in part, expressly rejected the proposition for which the majority cites *Swain:*

> "The State contends that our holding will eviscerate the fair trial values served by the peremptory challenge. . . . While we recognize, of course, that the peremptory challenge occupies an important position in our

trial procedures, we do not agree that our decision today will undermine the contribution the challenge generally makes to the administration of justice. The reality of practice, amply reflected in many state- and federal-court opinions, shows that the challenge may be, and unfortunately at times has been, used to discriminate against black jurors. By requiring trial courts to be sensitive to the racially discriminatory use of peremptory challenges, our decision . . . furthers the ends of justice." 476 U. S., at 98–99 (footnote omitted).

A prohibition on the use of peremptory challenges purposely to exclude members of distinctive groups on the basis of their "distinctive" attribute would leave the peremptory challenge system almost entirely untouched. The majority's exaggerated claim that "postmen, or lawyers, or clergymen" are distinctive groups within the meaning of our fair-cross-section cases, *ante,* at 486, will no doubt be quickly interred if ever a litigant reaches the Supreme Court claiming that such groups are "distinctive." To date, at least, this Court has found only women and certain racial minorities to have the sorts of characteristics that would make a group "distinctive" for fair-cross-section purposes. See *Lockhart, supra,* at 175 (citing cases).

More fundamentally, the majority's conclusion proves far more than I think even it intends. Unless it is limited by some principle that is not apparent on its face, the Court's decision today provides that the fair-cross-section requirement is unconcerned even with a prosecutor's systematic use of peremptory challenges to exclude Afro-American prospective jurors on the ground that they, as a class, lack the intelligence or impartiality fairly to fill the juror's role. Indeed, there is no principle by which the majority could distinguish such a case from a similar policy of the state attorney general's office. Although I cannot conceive that the majority intends any such holding, the lack of a limiting principle makes me wonder on what basis I should be so sanguine.

Perhaps the most obvious answer to the majority's concerns about destruction of the peremptory challenge system is that the acceptance of Holland's argument in this case will have absolutely no effect on the peremptory challenge system. We have held that the Fourteenth Amendment prohibits prosecutors from exercising peremptory challenges to exclude Afro-American jurors on the basis of their race. *Batson*, 476 U. S. 79 (1986). Five Members of the Court today make clear that the race of the defendant is irrelevant to the operation of that prohibition. See *supra*, at 491–492 (MARSHALL, J., joined by BRENNAN and BLACKMUN, JJ., dissenting); *ante*, at 488–490 (KENNEDY, J., concurring); *post*, at 505–508 (STEVENS, J., dissenting). Whatever "damage" my interpretation of the Sixth Amendment would do to the peremptory challenge system has already been done under the Fourteenth Amendment. The practical effect of this case (in the arena with which the majority is concerned) is nil.

## III

The majority today insulates an especially invidious form of racial discrimination in the selection of petit juries from Sixth Amendment scrutiny. To reach this result, the majority chooses to pretend that it writes on a blank slate, ignoring precedent after precedent. The majority then conjures up specters—of the dreaded "representative jury" requirement and of the destruction of our "venerable" system of peremptory challenges—as though they were real sources of concern. Our recent refusal in *Batson* to permit such fantastic fears to override our constitutional duty in the equal protection context makes clear, however, that these apparitions vanish on close examination.

Even had the majority marshaled the sorts of arguments that normally accompany the rejection of the principles underlying a whole line of cases, I would remain dubious. The elimination of racial discrimination in our system of criminal justice is not a constitutional goal that should lightly be

set aside.  Because the majority apparently disagrees,[2] I dissent.

JUSTICE STEVENS, dissenting.

When jury selection began for petitioner Daniel Holland's trial, he was presented with up to 40 jurors eligible for service.  In accordance with Illinois law, the panel was blindly drawn from an active jury list,[1] which in turn was composed at random,[2] from a broad cross section of the com-

---

[2] The majority considers "rando[m]" my suggestion that its opinion today signals a retreat from our previous efforts to eradicate racial discrimination.  *Ante*, at 486.  Our cases have repeatedly used the Sixth Amendment's fair-cross-section requirement as a weapon to combat racial discrimination.  See *supra*, at 493–495.  Yet today, the majority says that the Sixth Amendment is no more concerned with discrimination against Afro-Americans than it is with discrimination against "postmen."  *Ante*, at 486.  The majority concludes that "[r]ace as such has nothing to do with the legal issue in this case."  *Ibid.*  I read these statements as a retreat; that the majority has so little understanding of our Sixth Amendment jurisprudence that it considers that criticism "rando[m]" is, if anything, proof that it is right on the mark.

[1] Illinois provides two methods of drawing petit jurors—both random—for single county circuits and other than single county circuits respectively. The provision applicable to petitioner's case, Ill. Rev. Stat., ch. 78, ¶ 32.1 (1987), provides in pertinent part:

"In single county circuits, the chief judge of the circuit court of the county shall certify to the clerk of the court the number of petit jurors required each month.  The clerk shall then repair to the office of the jury commissioners and there, in the presence of the persons mentioned in Section 8 of this Act, proceed to draw by lot the necessary number of names from those made available for such drawing as in Section 8 of this act provided."

The record is somewhat unclear as to the number of prospective jurors drawn for petitioner's petit jury.  See Brief for Petitioner 2 (30, 35, or 40 prospective jurors).

[2] Ill. Rev. Stat., ch. 78, ¶ 31 (1987):

"In such manner as may be prescribed by rules to be adopted by majority vote of said judges, the jury commissioners shall also:

"(a) From time to time prepare a secondary list to be known as the active jury list, containing such number of names taken from the general jury list, not less than 5% of the aggregate thereof, as shall be appointed by the said

munity.[3]  At the commencement of *voir dire*, however, the
State abandoned this neutral selection process.  Rather than
eliminating jurors on an individualized basis on the grounds
of partiality or necessity, the prosecutor allegedly removed
all the black jurors in the belief that no black citizen could be
a satisfactory juror or could fairly try the case.  As the
Court acknowledges, that practice is "obviously" unlawful.
*Ante*, at 487.  The Court nonetheless does not reach the
equal protection issue and, with respect to petitioner's Sixth
Amendment claim, holds that the fair-cross-section principle
of that Amendment does not "require anything beyond the
inclusion of all cognizable groups in the venire."  *Ante*, at
478.  In my opinion, it is appropriate to review petitioner's
equal protection claim, because a showing that black jurors
have been eliminated solely on account of their race not only
is sufficient to establish a violation of the Fourteenth Amend-

rules, and in addition thereto, such other lists, to be known as period jury
lists, as the said rules may require.  Such period jury lists, if provided for,
shall contain the names of prospective jurors who shall have indicated,
either before or after being summoned for jury duty, at what time of the
year they would most conveniently serve.  The active jury list and, except
as to the names of persons certified back by the clerk of the court as pro-
vided in Section 10 of this act, the period jury lists, shall be prepared by
selecting every twentieth name, or other whole number rate necessary to
obtain the number required, or, in counties having a population greater
than 1,000,000, in a manner prescribed by the judge in charge of jury selec-
tion, from the general jury list which shall be arranged by towns or pre-
cincts for this purpose.  The count shall run continuously rather than
starting over with each town or precinct."

[3] ¶ 25:

"The said commissioners upon entering upon the duties of their office, and
every 4 years thereafter, shall prepare a list of all legal voters or if they
desire it may include the Illinois driver's license holders of each town or
precinct of the county possessing the necessary legal qualifications for jury
duty, to be known as the jury list.  The list may be revised and amended
annually in the discretion of the commissioners."

At the time of petitioner's trial, Illinois provided exemptions, common to
many States, for public officials, practicing physicians, and practicing at-
torneys, among others.  ¶ 4 (repealed 1987).

ment but also is sufficient to establish a violation of the Sixth Amendment. A jury that is the product of such a racially discriminatory selection process cannot possibly be an "impartial jury" within the meaning of the Sixth Amendment.

## I

Petitioner presented two arguments to the Illinois Supreme Court in support of his claim that the racially discriminatory exclusion of black jurors from his jury violated the Federal Constitution. First, he argued that the discriminatory exclusion of all the potential black jurors from his jury violated his personal right under the Sixth Amendment to a jury drawn from a cross section of the community. Second, he argued that the State's discriminatory use of peremptory challenges also violated the jurors' equal protection rights which he had third-party standing to assert. The state court addressed and rejected both claims on the merits.

The Court today decides only petitioner's Sixth Amendment claim and refuses to reach the equal protection argument, even though we are unanimous in agreeing that "the systematic exclusion of blacks from the jury system through peremptory challenges" is "obviously" unlawful. *Ante*, at 486–487; see *ante*, at 488 (KENNEDY, J., concurring); *ante*, at 491 (MARSHALL, J., dissenting). It does so because petitioner did not reiterate before this Court his argument that the discriminatory exclusion of black jurors violated the Equal Protection Clause. The same situation was presented in *Batson* v. *Kentucky*, 476 U. S. 79 (1986). There, as here, the petitioner declined to challenge the discriminatory exercise of peremptory challenges on equal protection grounds, framing the issue at argument and in his briefs in Sixth Amendment terms. See *id.*, at 112–115 (Burger, C. J., dissenting).[4] We nonetheless prescinded the Sixth Amend-

---

[4] Just as the State in *Batson* argued that the Equal Protection Clause was central to petitioner's argument, so the State here has argued that petitioner's claim is an equal protection argument in disguise and that, as such, it is not meritorious. See Brief for Respondent 20–21, 24–27. I

ment question, *id.*, at 85, n. 4, and rested our decision in the petitioner's favor entirely on the Equal Protection Clause. Our decision in *Batson* makes it appropriate to begin our analysis by recognizing that petitioner's equal protection argument is plainly meritorious and entitles him to relief.

As JUSTICE KENNEDY and JUSTICE MARSHALL note, the concerns that were expressed in *Batson* are not properly confined to the context in which a defendant objects to the exclusion of jurors of his own race but support also "an equal protection claim by a defendant whose race or ethnicity is different from the dismissed juror's." *Ante*, at 488 (KENNEDY, J., concurring); see *ante*, at 491–492 (MARSHALL, J., dissenting). Our decision in *Batson* was based on the conclusion that "[r]acial discrimination in the selection of jurors harms not only the accused whose life or liberty they are summoned to try," but also "the excluded juror." 476 U. S., at 87. "Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice." *Ibid.* Batson was a black citizen, but he had no interest in serving as a juror and thus was not a member of the excluded class. His standing to vindicate the interests of potential black jurors was based on his status as a defendant.[5] Indeed, the suggestion that only defendants of the same race or ethnicity as the excluded jurors can enforce the jurors' right to equal treatment and equal respect recognized in *Batson* is itself inconsistent with the central message of the Equal Protection Clause.[6]

---

agree that the two claims overlap; indeed, the requirement of impartiality is, in a sense, the mirror image of a prohibition against discrimination.

[5] Although we stated in *Batson* that the defendant's right to have jurors "'indifferently chosen,'" 476 U. S., at 87 (quoting 4 Blackstone, Commentaries 350 (Cooley ed. 1899)), was also implicated by the discriminatory selection mechanism, we declined to rest our decision on the defendant's personal right to an impartial jury. 476 U. S., at 85, n. 4.

[6] As one commentator has noted:

"If defendants were allowed to challenge the exclusion only of members of their own races, a defendant whose grandparents were black, Hispanic, Asian, and Native American apparently would be permitted to challenge

"[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case." *Id.*, at 89. As JUSTICE KENNEDY states, while the inference that the discriminatory motive is at work is stronger when the excluded jurors are of the same race or ethnicity as the defendant, the discriminatory use of peremptory challenges is not limited to that situation but may be present when, as here, the excluded jurors are not of the same race as the defendant. *Ante*, at 490 (concurring opinion). Petitioner, however, was not permitted to present any evidence to support his claim because the state court ruled that he did not have standing to assert the rights of the excluded jurors. For the reasons stated by JUSTICE KENNEDY, that ruling was plainly wrong. My opinion, however, that petitioner should have been permitted to prove that the exclusion of black jurors violated the Equal Protection Clause also leads me to the conclusion that petitioner should be entitled to prove that the State has violated the fair-cross-section principle of the Sixth Amendment.

## II

Fifteen years ago, in *Taylor* v. *Louisiana*, 419 U. S. 522 (1975), we unambiguously held that "the American concept of

---

the exclusion of members of all of these groups. A defendant whose ancestry was less diverse would have less power to object to a prosecutor's racial discrimination. In determining precisely what ancestry would qualify a defendant as black, white, brown or red, courts might find guidance in some older decisions of states that practiced *de jure* segregation, in the opinions of South African tribunals, and in the precedents of Nazi Germany." Alschuler, The Supreme Court and the Jury: Voir Dire, Peremptory Challenges, and the Review of Jury Verdicts, 56 U. Chi. L. Rev. 153, 191–192 (1989) (footnote omitted).

See also *Ristaino* v. *Ross*, 424 U. S. 589, 596, n. 8 (1976) ("In our heterogeneous society policy as well as constitutional considerations militate against the divisive assumption—as a *per se* rule—that justice in a court of law may turn upon the pigmentation of skin, the accident of birth, or the choice of religion").

the jury trial contemplates a jury drawn from a fair cross section of the community." *Id.*, at 527. Although *Taylor's* reliance on the Sixth Amendment was novel, the constitutional principle that it vindicated was ancient. Long before *Duncan* v. *Louisiana*, 391 U. S. 145 (1968), held that the Sixth Amendment is applicable to the States, it was "part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community," *Smith* v. *Texas*, 311 U. S. 128, 130 (1940), and exclusion of a cognizable group from jury service was considered to "contraven[e] the very idea of a jury," *Carter* v. *Jury Comm'n of Greene County*, 396 U. S. 320, 330 (1970).[7] We stated over a century ago—and have often reiterated since—

---

[7] *Taylor* v. *Louisiana*, 419 U. S. 522 (1975), relied on cases decided in the exercise of our supervisory power over the federal courts, as well as cases decided under the Equal Protection Clause. See *Ballard* v. *United States*, 329 U. S. 187 (1946); *Thiel* v. *Southern Pacific Co.*, 328 U. S. 217, 220 (1946) ("The American tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community. This does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would be impossible. But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups. Recognition must be given to the fact that those eligible for jury service are to be found in every stratum of society. Jury competence is an individual rather than a group or class matter. That fact lies at the very heart of the jury system. To disregard it is to open the door to class distinctions and discriminations which are abhorrent to the democratic ideals of trial by jury"); *Glasser* v. *United States*, 315 U. S. 60, 85–86 (1942) ("[T]he proper functioning of the jury system, and, indeed, our democracy itself, requires that the jury be a 'body truly representative of the community,' and not the organ of any special group or class. If that requirement is observed, the officials charged with choosing federal jurors may exercise some discretion to the end that competent jurors may be called. But they must not allow the desire for competent jurors to lead them into selections which do not comport with the concept of the jury as a cross-section of the community. Tendencies, no matter how slight, toward the selection of jurors by any method other than a process which will insure a trial by a representative

that a defendant is entitled to "an impartial jury trial, by jurors indifferently selected or chosen without discrimination against such jurors because of their color." *Ex parte Virginia,* 100 U. S. 339, 345 (1880) (citing *Strauder* v. *West Virginia,* 100 U. S. 303 (1880)). Just as the potential juror has the right not to be excluded from jury service solely on account of race, so "[a]n accused is entitled to have charges against him considered by a jury in the selection of which there has been neither inclusion nor exclusion because of race." *Cassell* v. *Texas,* 339 U. S. 282, 287 (1950) (plurality opinion); see also *id.,* at 295 (Frankfurter, J., concurring) ("The prohibition of the Constitution against discrimination because of color does not require in and of itself the presence of a Negro on a jury. . . . The basis of selection cannot con-

---

group are undermining processes weakening the institution of jury trial, and should be sturdily resisted").

It should not be surprising that the Sixth Amendment right to an impartial jury as "an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge," *Duncan* v. *Louisiana,* 391 U. S., at 156, guarantees not only impartial jurors but also procedural safeguards such as a selection mechanism that is fair and permits the judgment of the community to be brought to bear on the case. Our law recognizes as much in several other respects. Even though each individual juror might be impartial, the Sixth Amendment still requires that the jury have at least six members, *Ballew* v. *Georgia,* 435 U. S. 223 (1978), that the verdict be agreed upon by at least five jurors, *Burch* v. *Louisiana,* 441 U. S. 130 (1979), and that the defendant be accorded *voir dire, Turner* v. *Murray,* 476 U. S. 28, 36 (1986). See also *Tanner* v. *United States,* 483 U. S. 107, 127 (1987) (noting procedural safeguards that protect Sixth Amendment right to impartial jury). So it is with the fair-cross-section requirement. Although that requirement is not expressed in the text of the Sixth Amendment, it is inherent in its purpose that the defendant be judged by a body fairly selected and fully independent of the State. Indeed, in his first Inaugural Address, President Thomas Jefferson identified among the "principles [that] form the bright constellation which has gone before us, and guided our steps through an age of revolution and reformation," that of "trial by juries *impartially selected.*" 3 Writings of Thomas Jefferson 322 (Memorial ed. 1903) (emphasis added).

sciously take color into account. Such is the command of the Constitution").

The fair-cross-section principle is central to our understanding of the Sixth Amendment. It has been upon the basis of the promise of the fair cross section that we have held that a six-person jury does not contravene the Constitution, see *Williams* v. *Florida*, 399 U. S. 78, 102 (1970) ("As long as arbitrary exclusions of a particular class from the jury rolls are forbidden, see, *e. g.*, *Carter* v. *Jury Commission*, 396 U. S. 320, 329–330 (1970), the concern that the cross-section will be significantly diminished if the jury is decreased in size from 12 to six seems an unrealistic one"), and that we have permitted nonunanimous verdicts, see *Apodaca* v. *Oregon*, 406 U. S. 404, 413 (1972) (opinion of WHITE, J.) ("All that the Constitution forbids, however, is systematic exclusion of identifiable segments of the community from jury panels and *from the juries ultimately drawn from those panels*") (emphasis added). It has also been on the basis of the fair-cross-section requirement that we have refused to scrutinize jury verdicts under the Equal Protection Clause, see *McCleskey* v. *Kemp*, 481 U. S. 279, 309–310 (1987) ("Because of the risk that the factor of race may enter the criminal justice process, we have engaged in 'unceasing efforts' to eradicate racial prejudice from our criminal justice system. *Batson* v. *Kentucky*, 476 U. S. 79, 85 (1986). Our efforts have been guided by our recognition that 'the inestimable privilege of trial by jury . . . is a vital principle, underlying the whole administration of criminal justice,' *Ex parte Milligan*, 4 Wall. 2, 123 (1866). Thus, it is the jury that is a criminal defendant's fundamental 'protection of life and liberty against race or color prejudice.' *Strauder* v. *West Virginia*, 100 U. S. 303, 309 (1880)").[8]

---

[8] Our decision in *McCleskey* v. *Kemp*, 481 U. S. 279 (1987), should dispel any doubt that the fair-cross-section requirement and the prohibition against racial discrimination in the selection of juries expressed in such cases as *Batson* v. *Kentucky*, 476 U. S. 79 (1986), does not exist only to

The fair-cross-section requirement mandates the use of a neutral selection mechanism to generate a jury representative of the community. It does not dictate that any particular group or race have representation on a jury. See *Lockhart* v. *McCree*, 476 U. S. 162, 173, 178 (1986); *Taylor*, 419 U. S., at 538; *Apodaca*, 406 U. S., at 413 (opinion of WHITE, J.); *Cassell*, 339 U. S., at 286–287. The Constitution does not permit the easy assumption that a community would be fairly represented by a jury selected by proportional representation of different races any more than it does that a community would be represented by a jury composed of quotas of jurors of different classes. Cf. *Castaneda* v. *Partida*, 430 U. S. 482, 499–500 (1977); see also *id.*, at 503 (MARSHALL, J., concurring).[9] In fact, while a racially balanced jury would be representative of the racial groups in a community, the focus on race would likely distort the jury's reflection of other groups in society, characterized by age, sex, ethnicity, religion, education level, or economic class.[10] What the Con-

---

protect black defendants. We there held that the jury system and the fair-cross-section principle were designed to eliminate any discrimination in the imposition of sentence based on the race of *the victim.*

[9] See *Mobile* v. *Bolden*, 446 U. S. 55, 88 (1980) (STEVENS, J., concurring in judgment) ("A prediction based on a racial characteristic is not necessarily more reliable than a prediction based on some other group characteristic. . . . In the long run there is no more certainty that individual members of racial groups will vote alike than that members of other identifiable groups will do so"); *Cousins* v. *City Council of Chicago*, 466 F. 2d 830, 852 (CA7) (dissenting opinion) ("Respect for the citizenry in the black community compels acceptance of the fact that in the long run there is no more certainty that these individuals will vote alike than will individual members of any other ethnic, economic, or social group"), cert. denied, 409 U. S. 893 (1972).

[10] As one commentator has explained:

"So many identifiable interests have already emerged that the mathematical problems are almost insurmountable. The computer attempting to structure each jury would have to consider the race, sex, age, income, occupation, educational level, and religion of each juror—and perhaps other factors as well—in order to be sure that all relevant demographic

stitution does require is "a fair possibility for obtaining a representative cross-section of the community." *Williams* v. *Florida*, 399 U. S., at 100; see also *Ballew* v. *Georgia*, 435 U. S., at 236–237 (plurality opinion); *id.*, at 245 (WHITE, J., concurring in judgment).

Our previous cases explain the operation of the fair-cross-section requirement. In *Taylor*, we held unconstitutional a state provision that required women, but not men, to file a written declaration before they were placed in the jury pool. Because the provision was directed at excluding a distinctive group from jury service and was not based on any legitimate state purpose, it ran afoul of the "defendant's Sixth Amend-

---

characteristics would be considered. Furthermore, a juror selected under this system might feel that she or he is filling some predetermined 'slot' and might attempt to give the view generally associated with those demographic characteristics rather than the juror's personal feelings about the case. The jurors might find it harder to work together as a group because they may be more conscious of their identified differences than the much stronger common bonds that unite them as people.

"The logical, and desirable, way to impanel an impartial and representative jury—and the method chosen by Congress—is to put together a complete list of eligible jurors and select randomly from it, on the assumption that the laws of statistics will produce representative juries most of the time. This approach safeguards the selection process from possible manipulation and ensures the independence of the jury. Such a randomly selected jury will not necessarily be 'impartial' in the strict sense of that term, because the jurors bring to the jury box prejudice and perspectives gained from their lifetimes of experience. But they will be impartial in the sense that they will reflect the range of the community's attitudes, which is the best we can do. The random approach recognizes that our 'community' has enlarged because of the technological revolution that has provided us with communication links and common sources of information, but it also ensures that the diversity within our society is reflected on our juries because each population group is represented insofar as possible in proportion to its strength in the population." J. Van Dyke, Jury Selection Procedures 18 (1977).

Cf. Amar, Choosing Representatives by Lottery Voting, 93 Yale L. J. 1283, 1288–1289, 1293 (1984) (choice of jurors by random selection best replicates underlying distribution of views in community).

ment right to a jury drawn from a fair cross section of the community." 419 U. S., at 534. In *Duren* v. *Missouri*, 439 U. S. 357 (1979), a Missouri provision gave women an automatic exemption from jury service. Like the Louisiana provision in *Taylor,* Missouri's automatic exemption resulted in underrepresentation of women at the venire stage and was justified only by the stereotype that most women would be unable to serve because of their domestic responsibilities. 439 U. S., at 369.[11] We therefore held the provision unlawful.

*Taylor* and *Duren* insure that the jury pool and venire will be reasonably representative of the community. A reasonably representative jury pool, however, is not the ultimate goal of the Sixth Amendment: a State surely could not place all of its citizens in the jury pool, but then arbitrarily provide that members of certain cognizable groups would not be permitted to serve on a jury or could only serve if they overcame a special hurdle not applicable to other jurors. The Sixth Amendment guarantees the accused "an impartial jury," not just an impartial jury venire or jury pool. The State may remove jurors at any stage on the grounds, among others, that service would cause hardship to the individual or community, see *Taylor,* 419 U. S., at 534; *Rawlins* v. *Georgia,* 201 U. S. 638 (1906), or that the individual juror is unable to render an impartial verdict, see *Lockhart* v. *McCree,* 476 U. S., at 175; cf. *Swain* v. *Alabama,* 380 U. S. 202, 220 (1965) ("[T]he view in this country has been that the system should guarantee 'not only freedom from any bias against the accused, but also from any prejudice against his prosecution'") (quoting *Hayes* v. *Missouri,* 120 U. S. 68, 70 (1887)). By the same token, however, the State may never arbitrarily remove jurors on a discriminatory basis unrelated to their ability to serve as jurors. Cf. *Lockhart,* 476 U. S., at 175.

---

[11] As then-JUSTICE REHNQUIST noted in *Duren,* our analysis under the Sixth Amendment bore a marked similarity to analysis under the Equal Protection Clause. 439 U. S., at 371 (dissenting opinion).

The Sixth Amendment's protection is not so frail that it can be defeated by the State's creation of an additional level of selection.[12]  Rather, by providing that juries be drawn through fair and neutral selection procedures from a broad cross section of the community, that Amendment insures a jury that will best reflect the views of the community—one that is not arbitrarily skewed for or against any particular group or characteristic.

Applying these principles, it is manifest that petitioner has stated a claim under the Sixth Amendment.  Petitioner claimed at trial that the prosecutor systematically eliminated all the black jurors from his venire on the basis not that they were partial but that no black juror was competent to serve.[13]  The state courts rejected this claim without a hearing, holding that the exercise of peremptory challenges can never violate the fair-cross-section requirement.  Prior to our decision in *Batson* v. *Kentucky*, 476 U. S. 79 (1986), I assume that that ruling would have been correct and that petitioner's

---

[12] For example, if a State passed a statute mandating *voir dire* examination of all male white venirepersons before any female or black venirepersons, that statute would violate the Sixth Amendment as well as the Equal Protection Clause.  Cf. *Smith* v. *Texas*, 311 U. S. 128 (1940).  The statute would have an obvious tendency "systematically" to exclude female and black citizens from the petit jury directly contrary to the teaching of our Sixth Amendment cases.

[13] Petitioner also claimed that the jury venire and jury did not fairly represent the proportion of black persons in the community.  App. 12–13.  To the extent that his Sixth Amendment claim is based on the contention that the State prevented a "distinctive group in the community from being represented on his jury," *ante*, at 477–478, I agree with the Court that a defendant is not entitled to jurors of any particular race on his jury.  The Sixth Amendment no more permits the prosecutor to remove a white juror on the categorical assumption that he will not represent the views of prospective black jurors than it permits the prosecutor to remove a black juror on the assumption that he is incompetent to serve.  In both instances, the prosecutor would be determining qualification to serve on the basis of race, a determination that the prosecutor is not permitted to make.  Cf. *Cassell* v. *Texas*, 339 U. S. 282, 287 (1950) (plurality opinion); *id.*, at 295 (Frankfurter, J., concurring).

argument would not have been successful. For *Swain* v. *Alabama,* 380 U. S. 202 (1965), had established a virtually irrebuttable presumption that "the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case before the court." *Id.,* at 222. That presumption could not be overcome by the prosecutor's use of peremptories to eliminate all the black jurors on the venire, *ibid.,* but only by a showing that "the prosecutor in a county, in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be, is responsible for the removal of Negroes who have been selected as qualified jurors by the jury commissioners and who have survived challenges for cause, with the result that no Negroes ever serve on petit juries." *Id.,* at 223. Under previous law, the Illinois Supreme Court and this Court would have been correct in presuming along with the *Swain* Court that all peremptory challenges are exercised for nondiscriminatory reasons.

*Batson,* however, created an important, though limited, exception to the *Swain* presumption. Under *Batson,* a defendant is permitted to establish from "the totality of relevant facts," 476 U. S., at 94, that black jurors have been excluded on the basis of race and that the system of peremptory challenges has been operated in a discriminatory fashion. The peremptory challenge procedure, when it is used to remove members of a particular racial group, is no longer presumed to serve the State's interest in obtaining a fair and impartial jury. If a defendant is able to prove for equal protection purposes that the prosecutor's "strikes were based on the belief that no black citizen could be a satisfactory juror or fairly try" the case, *id.,* at 101 (WHITE, J., concurring), and that the State is operating a discriminatory "selection procedure," *id.,* at 87, that same showing necessarily establishes that the defendant does not have a fair possibility of obtaining a representative cross section for Sixth Amendment purposes. As we have explained, *Batson* has under-

pinnings both in the juror's equal protection right to be free of discrimination and in the defendant's right to a fair and impartial factfinder:

"By serving a criminal defendant's interest in neutral jury selection procedures, the rule in *Batson* may have some bearing on the truthfinding function of a criminal trial. . . . Significantly, the new rule joins other procedures that protect a defendant's interest in a neutral factfinder. Those other mechanisms existed prior to our decisions in *Batson*, creating a high probability that the individual jurors seated in a particular case were free from bias." *Allen* v. *Hardy*, 478 U. S. 255, 259 (1986) (footnote omitted).

The operation of a facially neutral peremptory challenge procedure in a discriminatory manner is no less a violation of the defendant's Sixth Amendment right to a jury chosen from a fair cross section of the community than it is a violation of the juror's right to equal protection.[14]

The Court rejects petitioner's Sixth Amendment claim on the basis of three assumptions, two explicit and one implicit. First, it asserts that the tradition of peremptory challenges for the prosecution was "venerable" at the time of the ratification of the Sixth Amendment and thereby presumably im-

---

[14] Justice Simon, dissenting in the Illinois Supreme Court, properly recognized the significance of our decision in *Batson:*

"Under the sixth amendment, a defendant is entitled to a fair cross-section of the community on the jury. *Taylor* v. *Louisiana*, 419 U. S. 522 (1975). This has been interpreted to guarantee that the jury venire be selected in a nondiscriminatory manner from a source fairly representative of the community, even though *Taylor* does not go so far as to guarantee a representative petit jury. But as already mentioned, *Batson* has added an additional dimension to this analysis: although a petit jury selected from a proper panel need not necessarily reflect a cross-section of the community, discriminatory tactics designed to manipulate the ultimate composition of the petit jury will no longer be tolerated." 121 Ill. 2d 136, 184–185, 520 N. E. 2d 270, 292 (1987).

mune from challenge. This assertion is both misleading[15] and an insufficient response to petitioner's claim that the State operated a system of discriminatory peremptory challenges. The Court has forsworn reliance on venerable history to give meaning to the Sixth Amendment's numerosity and unanimity requirements, see *Apodaca* v. *Oregon*, 406 U. S. 404 (1972); *Williams* v. *Florida*, 399 U. S. 78 (1970); the less venerable history of nondiscriminatory peremptory

---

[15] Even as to the use of peremptory challenges to remove partial jurors, the Court's historical claims are significantly overstated. If the Court wishes to have it that the exercise of peremptory challenges by the prosecution has a venerable tradition, it will have to do better than Blackstone and the 1790 Congress. What Blackstone actually said with respect to peremptory challenges was that peremptory challenges were allowed the prisoner "in criminal cases, or at least in capital ones, . . . *in favorem vitae*," but that "[t]his privilege, of peremptory challenges, though granted to the prisoner, is denied to the king, by the statute of 33 Edw. I. st. 4, which enacts, that the king shall challenge no jurors without assigning a cause certain, to be tried and approved by the court." 4 W. Blackstone, Commentaries 346–347 (1769). The statute passed by the 1790 Congress, Act of Apr. 30, 1790, ch. 9, § 30, 1 Stat. 119, similarly recognized the defendant's right of peremptory challenges, but was silent with respect to the government's. See *United States* v. *Shackleford*, 18 How. 588 (1856). Although *United States* v. *Marchant*, 12 Wheat. 480 (1827), suggests that the government's common-law right to "stand aside" survived the 1790 Act, the Court has rejected the proposition that the 1790 Act reflects or "draws" with it the prosecutor's right of peremptory challenge. See 18 How., at 590. Contrary to the Court's contention, the prosecutor has not had the right of peremptory challenge "through two centuries in all the States." *Ante*, at 481. The exercise of peremptory challenges by the prosecution was a subject of debate throughout the 18th and 19th centuries and the two most populous States in the Nation's first century, New York and Virginia, did not permit the prosecutor peremptories until 1881 and 1919 respectively. See Van Dyke, *supra*, n. 10, at 147–150, 167; see also Goldwasser, Limiting a Criminal Defendant's Use of Peremptory Challenges: On Symmetry and the Jury in a Criminal Trial, 102 Harv. L. Rev. 808, 827–828 (1989). It is also worthy of note that a clause providing the "right of challenge" was contained within the original draft of the Sixth Amendment but was eliminated by the Senate prior to ratification. See 1 Annals of Cong. 435 (1789).

challenges surely cannot resolve any conflict between the fair-cross-section requirement and the exercise of discriminatory peremptory challenges.

Second, the Court contends that the exercise of peremptory challenges always serves the State's "legitimate interest" in obtaining an impartial jury. *Ante*, at 483. That contention rests on the assumption that a black juror may be presumed to be partial simply because he is black—an assumption that is impermissible since *Batson*. Petitioner's claim is that the State may not operate a jury selection mechanism, including a system of peremptory challenges, that eliminates black jurors solely on account of race.[16] It hardly answers petitioner's claim to state that the system of peremptory challenges "traditional[ly]" operates "by allowing both the accused and the State to eliminate persons thought to be inclined against their interests." *Ante*, at 480.

Finally, the Court contends that recognition of the Sixth Amendment right "would cripple the device of peremptory challenge." *Ante*, at 484. The same argument was made in *Batson* in the same context: a defendant's claim that peremptory challenges were used to discriminate against black jurors. After our recognition that a defendant could bring an

---

[16] The Court misconstrues petitioner's claim as one that the Sixth Amendment requires representation of all identifiable groups on the petit jury. *Ante*, at 484. Petitioner, however, makes no such claim. The Sixth Amendment does not forbid the State to remove jurors on the basis of partiality or other *relevant* individual characteristics. Even if the prosecutor's peremptory challenges based on such considerations, when aggregated, could be considered to result in the exclusion of a "cognizable group," that group by definition would be one that is ineligible for jury service for legitimate state reasons. The defendant's right to "a *fair* possibility" for obtaining a representative cross section would not be impaired. Petitioner does argue, however, that the State may not remove jurors for unconstitutional reasons or reasons relevant only to eliminating a group from the community eligible for jury service. That is, the State may not remove jurors solely on account of race. In that case, the defendant is being "unfairly" deprived of the opportunity for obtaining a cross section.

equal protection challenge to the removal of black jurors in a single case, it is difficult to see why recognition of a Sixth Amendment right would impose any additional burden. In any event, our answer to the State in *Batson* is a sufficient response to the Court here:

> "While we recognize, of course, that the peremptory challenge occupies an important position in our trial procedures, we do not agree that our decision today will undermine the contribution the challenge generally makes to the administration of justice. The reality of practice, amply reflected in many state- and federal-court opinions, shows that the challenge may be, and unfortunately at times has been, used to discriminate against black jurors. By requiring trial courts to be sensitive to the racially discriminatory use of peremptory challenges, our decision enforces the mandate of equal protection and furthers the ends of justice. In view of the heterogeneous population of our Nation, public respect for our criminal justice system and the rule of law will be strengthened if we ensure that no citizen is disqualified from jury service because of his race.
>
> "Nor are we persuaded by the State's suggestion that our holding will create serious administrative difficulties. In those States applying a version of the evidentiary standard we recognize today, courts have not experienced serious administrative burdens, and the peremptory challenge system has survived. We decline, however, to formulate particular procedures to be followed upon a defendant's timely objection to a prosecutor's challenges." *Batson* v. *Kentucky*, 476 U. S., at 98–99 (footnotes omitted).

I respectfully dissent.