596 So.2d 1083 (1992)
Ramon ALEN, Appellant,
v.
The STATE of Florida, Appellee.
No. 90-1.
District Court of Appeal of Florida, Third District.
March 3, 1992.
Bennett H. Brummer, Public Defender, and Robert Kalter, Asst. Public Defender, for appellant.
Robert A. Butterworth, Atty. Gen., and Charles M. Fahlbusch, Asst. Atty. Gen., for appellee.
*1084 Before SCHWARTZ, C.J., and BARKDULL, HUBBART, NESBITT, BASKIN, FERGUSON, JORGENSON, COPE, LEVY, GERSTEN and GODERICH, JJ.
NESBITT, Judge.
Following briefing and oral argument en banc, this court was confronted with the unsettled issue whether Hispanics constitute a cognizable group within this community so as to entitle a defendant, pursuant to article I, section 16 of the Florida Constitution, to dispute the state's use of a peremptory challenge against an Hispanic juror when the challenge is alleged to have been made solely on the basis of the juror's ethnicity. Shortly after oral argument, the United States Supreme Court issued opinions in two cases, Powers v. Ohio, ___ U.S. ___, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), and Hernandez v. New York, ___ U.S. ___, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), which require this court to broaden the scope of our analysis in deciding the case before us to include federal constitution equal protection considerations. Accordingly, for the reasons which follow, we conclude that under either state or federal constitutional analysis, the defendant must be awarded a new trial because of the state's improper use of a peremptory challenge to exclude an Hispanic juror.

Relevant Facts of This Case
The defendant was charged with robbery. When, during jury selection, the state attempted to peremptorily strike two prospective Hispanic jurors,[1] the defendant objected, claiming the state was using the challenges in a discriminatory manner in violation of State v. Neil, 457 So.2d 481 (Fla. 1984).[2] The trial court ordered an inquiry to determine the likelihood of discrimination. The state claimed that it excluded the first Hispanic juror because she appeared uninterested and disgusted with the proceedings. The state admitted having difficulty expressing a reason for striking the second Hispanic juror. The trial court allowed the state to strike these two jurors, holding that the strike of the uninterested juror was nondiscriminatory. The strike of the second juror was held to be nondiscriminatory because it was done in order to reach another Hispanic juror who the state claimed was more acceptable. The defendant was ultimately convicted of robbery. On appeal, the state counters the defendant's claim of a Neil violation with the assertion that, while Neil may apply to groups other than racial groups, Hispanics do not constitute a distinct, cognizable group for Neil purposes.

Analysis on State Constitutional Grounds
In Neil, the Supreme Court of Florida held that under article I, section 16 of the Florida Constitution, a defendant is entitled to an impartial jury where no juror has been excluded solely on the basis of his or her race. Neil dealt with the improper use of peremptory challenges to exclude black jurors, and the supreme court chose to limit the impact of its holding solely to race. The court stated, "The applicability to other groups will be left open and will be determined as such cases arise." 457 So.2d at 487.
While no Florida case since Neil has broadened the scope of that case's applicability to include cognizable groups other than racial groups, two of the three cases from other states upon which the supreme court relied in Neil did not limit their application to racial categorizations, but also identified other "cognizable groups", including ethnic groups. Commonwealth v. Soares, 377 Mass. 461, 387 N.E.2d 499, cert. denied, 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979); People v. Wheeler, 22 Cal.3d 258, 148 Cal. Rptr. 890, 583 P.2d 748 (1978). See Neil at 487. In the instant case, however, the state contends that Hispanics *1085 are not a cognizable ethnic group for purposes of insuring that they are not discriminatorily challenged based on group affiliation in violation of the defendant's impartial jury rights.
Whether or not a group is cognizable is a question of fact. Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954). See generally Fields v. People, 732 P.2d 1145 (Colo. 1987) (for a discussion of group cognizability and the right to an impartial jury). Generally speaking, an ethnic group can be identified on the basis of its members sharing certain identifiable traits including religious, linguistic, ancestral, or physical characteristics. The American Heritage Dictionary 450 (1973). Hispanics' identification as an ethnic group has been based on both ancestral characteristics, often typified by surname, e.g., People v. Trevino, 39 Cal.3d 667, 217 Cal. Rptr. 652, 704 P.2d 719 (1985); Fields, 732 P.2d at 1145, and linguistic traits, the common native language being Spanish. See Hernandez v. New York, supra.
Clearly, the community which embraces the circuit where this defendant was tried recognizes Hispanics as a cognizable ethnic group based upon classifications developed within the community itself which have been widely used for survey, polling, and other categorization purposes. According to 1990 United States Census data, the Dade County population is identified as 49.2 percent Hispanic. (The Census uses the term "Spanish origin.") Over 28 percent of Dade County's registered voters are categorized as Hispanic. Moreover, local media, as well as marketing surveys, consistently recognize Hispanics as an identifiable and distinct group in our community. See Trevino, 217 Cal. Rptr. at 661, 704 P.2d at 728 ("Governmental categorization ... signifies more than simple utility in statistical compilation [but] a broader understanding that individuals bearing [Spanish] [sur]names represent a discrete segment of the population based on ethnic commonality."). Accordingly, we hold that Hispanics are a cognizable ethnic group within this community for purposes of the application of Neil principles.

Analysis on Federal Constitutional Grounds
In Holland v. Illinois, 493 U.S. 474, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990), the United States Supreme Court held that the federal constitution's Sixth Amendment right to an impartial jury, the federal equivalent to the Florida Constitution's article I, section 16, does not prohibit the use of peremptory challenges on the basis of race. The Court instead has held that the prohibition has its source in the Equal Protection Clause to the Fourteenth Amendment to the federal constitution. See Powers v. Ohio, supra; Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Both Powers and Batson dealt with the use of peremptory challenges against black jurors. However, in Hernandez v. New York, supra, the Court addressed the discriminatory use of such challenges against Hispanics. The Court held that under the Equal Protection Clause, Hispanics cannot be peremptorily challenged on the basis of their race or ethnicity.
Consequently, in accordance with Hernandez v. New York, we hold that pursuant to the Equal Protection Clause of the United States Constitution, Hispanic jurors may not be peremptorily challenged solely on the basis of their ethnicity.

Application of Analysis
Applying the foregoing state and federal constitutional analysis to the facts of this case, the peremptory challenge of the first juror was based upon acceptably neutral grounds. The state's use of the ethnically motivated strike against the second juror, however, was constitutionally forbidden, see Jefferson v. State, 595 So.2d 38 (Fla. 1992); Smith v. State, 574 So.2d 1195 (Fla. 3d DCA 1991), aff'd on other grounds, State v. Washington, 594 So.2d 291 (Fla. 1992), and could not be made acceptable even though it was done to reach another Hispanic juror who ultimately served as an alternate. See State v. Slappy, 522 So.2d 18, 21 (Fla.), cert. denied, 487 U.S. 1219, 108 S.Ct. 2873, 101 L.Ed.2d 909 *1086 (1988). Accordingly, the trial court erred in permitting the state to strike the second Hispanic juror.
We therefore reverse the defendant's conviction and direct that he be awarded a new trial.
SCHWARTZ, C.J., and BARKDULL, BASKIN, FERGUSON, JORGENSON, COPE, LEVY and GODERICH, JJ., concur.
HUBBART, Judge (concurring).
By today's decision, the court extends the rule of State v. Neil, 457 So.2d 481 (Fla. 1984), to Hispanic Americans, concludes that the state had no ethnic-neutral reason for exercising a peremptory challenge below against a prospective Hispanic juror, and reverses the conviction under review for a new trial. Although I entirely agree with this decision for the reasons stated in the court's opinion, I think it marks the beginning of the end of the unfettered use of the peremptory challenge in this state. In my view, Neil will inevitably have to be extended in future cases so as to prohibit all forms of invidious discrimination in the use of the peremptory challenge  whether based on race, ethnic origin, nationality, gender, religion, wealth, or age  which of necessity will require an explanation for the exercise of most peremptory challenges. This result, when it comes, will, in my view, sound the death knell for the peremptory challenge system as we know it.
Rather than engage in a prolonged case-by-case strangulation of the peremptory challenge over a period of many years which in the end will effectively eviscerate the peremptory challenge or, at best, result in a convoluted and unpredictable system of jury selection enormously difficult to administer  I think the time has come, as Mr. Justice Marshall has urged, to abolish the peremptory challenge as inherently discriminatory. See Batson v. Kentucky, 476 U.S. 79, 107-08, 106 S.Ct. 1712, 1728-29, 90 L.Ed.2d 69, 94-95 (1986) (Marshall, J., concurring). I would, however, attempt to salvage the best of the peremptory challenge system by expanding the unduly narrow grounds for challenging a prospective juror for cause, so as to embrace the type of objective reasons which are presently recognized for properly exercising a peremptory challenge after a Neil inquiry. This latter result could, I think, be accomplished by some appropriate rule or statutory changes.

I
Plainly, under today's decision, a trial court inquiry is now required for a peremptory challenge exercised against a prospective Hispanic juror when the proper discriminatory showing is made  and such a challenge must be disallowed unless an ethnic-neutral reason is given for the challenge. By crossing over the race line to give Neil protection to an ethnic group, such as Hispanics, the courts, in my view, will have no principled basis for refusing to extend the same rule in future cases to peremptory challenges exercised solely on the basis of the prospective juror's ethnic origin, nationality, gender, religion, wealth, or age. In the past, Neil could arguably be confined solely to race in view of the country's unprecedented and disgraceful history of racial discrimination against African Americans; obviously, no such argument can now be mustered given today's decision. Stated differently, every discrimination-type ground which is presently recognized as a legal basis for attacking the composition of a grand or petit jury venire[1]  to wit: all of the above-stated invidious *1087 exclusions  must inevitably be recognized in the future as a legal basis for attacking the exercise of a peremptory challenge. Invidious discrimination of whatever type is entirely incompatible with a fair jury selection process  whether in the initial process of drawing a jury venire or in the later process of selecting a jury at trial from a jury venire.
This inescapable extension of Neil will clearly protect a large number of minority groups, which extension, in turn, will surely embrace everyone in the state under one or more protected categories. For example, in Dade County alone, there are many cognizable minority ethnic groups besides Hispanics: including Anglo Americans, Jewish Americans,[2] native Americans, Arab Americans, Asian Americans, and other European Americans. Indeed, the United States itself is a nation of immigrants, save for the native American Indian, and, consequently, all Americans belong to some minority, ethnic/national origin group which would appear eligible for Neil protection. J.F. Kennedy, A Nation of Immigrants (1964). Beyond that, the extension of Neil to prohibit gender, wealth, or age discrimination would also protect men and women, the poor and wealthy, and the young and old  which, of course, covers everyone in one or more categories. It therefore follows that any peremptory challenge exercised against any juror will be subject to attack under this inevitable extension of Neil if the proper discriminatory showing is made.
As a practical matter, it is not difficult to imagine that the issue of peremptory challenge discrimination will be raised in a variety of ways by astute counsel in future criminal and civil cases. For example, plausible claims may very well be made that opposing trial counsel is utilizing peremptory challenges to exclude poor jurors,[3] wealthy jurors,[4] young jurors,[5] women,[6] men,[7] or jurors who come from the same ethnic or national origin group as one of the parties [or the victim] in a case;[8] this list could be greatly extended and is obviously limited only by the ingenuity of counsel. When faced with the issue presented in these and related cases, I think the courts will be hard-pressed to condone any form of invidious discrimination in the exercise of the peremptory challenge.
Given this irresistible extension of Neil, it seems obvious that the peremptory challenge system, as we know it, is totally doomed. The pre-Neil system of peremptory challenges has been accurately described as follows:
"The essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry and without being subject to the court's control. State v. Thompson, 68 Ariz. 386, 206 P.2d 1037 (1949); Lewis v. United States, 146 U.S. 370, 378, 13 S.Ct. 136, 139, 36 L.Ed. 1011. While challenges for cause permit rejection of jurors on a narrowly specified, provable and legally cognizable basis of partiality, the peremptory permits rejection for a real or imagined partiality that is less easily designated or demonstrable. Hayes v. Missouri, 120 U.S. 68, 70, 7 S.Ct. 350, 351, 30 L.Ed. 578. It is often exercised upon the `sudden impressions and unaccountable prejudices we are *1088 apt to conceive upon the bare looks and gestures of another,' Lewis, supra, 146 U.S., at 376, 13 S.Ct., at 138, upon a juror's `habits and associations,' Hayes v. Missouri, supra, 120 U.S., at 70, 7 S.Ct., at 351, or upon the feeling that `the bare questioning (a juror's) indifference may sometimes provoke a resentment,' Lewis, supra, 146 U.S., at 376, 13 S.Ct., at 138. It is no less frequently exercised on grounds normally thought irrelevant to legal proceedings or official action, namely, the race, religion, nationality, occupation or affiliations of people summoned for jury duty."
Swain v. Alabama, 380 U.S. 202, 220, 85 S.Ct. 824, 835, 13 L.Ed.2d 759, 772-73 (1965) (emphasis added). The inevitable post-Neil extended system of peremptory challenges, however, radically alters all of this. Once the proper discriminatory showing is made, peremptory challenges (1) can no longer be exercised without giving proper reasons, subject to trial court inquiry and control, (2) can no longer be based on the prospective juror's race, ethnic origin, nationality, gender, religion, wealth, or age, and (3) can no longer be based on purely subjective factors, as such factors could otherwise be used as a subterfuge to mask discriminatory motives.[9]
The result of such a Neil extension is not a peremptory challenge system at all. It is a judicially controlled system of numerically limited juror challenges in which nondiscriminatory reasons must be given for exercising such challenges, once an initial discriminatory showing is made, and is therefore akin to a system of challenge for cause. Even if I am wrong and somehow the peremptory challenge could survive this Neil-extension onslaught, I am unconvinced that such a severely wounded system would be worth preserving. Plainly, it would be enormously cumbersome to operate, would invite frequent and divisive discrimination disputes in jury selection, and would, I think, be a fertile source of reversals and retrials; the appellate courts would necessarily have to shape the contours of such an elaborate system as to (1) when a threshold discriminatory showing is made, (2) what groups are covered by the Neil rule, and (3) what showing is required to establish whether a given juror belongs to a Neil-protected group  all of which are obvious sources of considerable litigation. Such a hybrid system would be convoluted and unpredictable at best, extremely difficult to administer and, in my view, not worth preserving.
The time has therefore come to abolish the peremptory challenge, as being "uniquely suited to masking discriminatory motives," State v. Slappy, 522 So.2d 18, 20 (Fla.), cert. denied, 487 U.S. 1219, 108 S.Ct. *1089 2873, 101 L.Ed.2d 909 (1988). As Mr. Justice Marshall has observed in urging just such a result, "[t]he inherent potential of peremptory challenges to distort the jury process by permitting the exclusion of jurors on racial [or other invidiously discriminatory] grounds should ideally lead the Court to ban them entirely from the criminal justice system." Batson, 476 U.S. at 106, 106 S.Ct. at 1728, 90 L.Ed.2d at 94 (Marshall, J., concurring). All challenges of prospective jurors should, I think, be based on objective nondiscriminatory reasons; none should be based on discriminatory reasons or purely subjective factors.

II
I am well aware that the peremptory challenge has occupied an historically important role in guaranteeing a fair jury trial in this country and state and that its best aspects should be preserved if at all possible. For that reason, I think the nondiscriminatory component of the peremptory challenge should be retained in an expanded system of challenge for cause.

A
Although "[t]he right to peremptory challenges is not of constitutional dimension," it has deep roots in Anglo American legal history and has served a vitally important role of "aid[ing] and assist[ing] in the selection of an impartial jury." State v. Neil, 457 So.2d at 486. It was first recognized at common law almost from the inception of the jury trial as an institution, and was later introduced in this country over 200 years ago in both the federal and state jurisdictions wherever trial by jury was guaranteed. Batson, 476 U.S. 79, 118-20, 106 S.Ct. 1712, 1734-35, 90 L.Ed.2d 69, 101-03 (Burger, C.J., dissenting). "The tradition of peremptory challenges for both the prosecution and the accused was already venerable at the time of Blackstone, was reflected in a federal statute enacted by the same Congress that proposed the Bill of Rights, was recognized in an opinion by Justice Story to be a part of the common law of the United States, and has endured through two centuries in all states." Holland v. Illinois, 493 U.S. 474, 481, 110 S.Ct. 803, 808, 107 L.Ed.2d 905, 917 (1990) (citations omitted). In Florida, peremptory challenges "have a long history" having first been introduced in 1828 when Florida was still a territory. Neil, 457 So.2d at 483 n. 1.
This long and venerable history speaks volumes for the proposition that "the peremptory challenge occupies an important position in our trial procedures" as it represents "one means of assuring the selection of a qualified and unbiased jury." Batson, 476 U.S. at 91, 98, 106 S.Ct. at 1720, 1724, 90 L.Ed.2d at 84, 89. Indeed, it has long been recognized that challenges for cause, as presently constituted, are inadequate to exclude many biased jurors from serving on a jury because such jurors will often neither concede their bias nor admit to facts which blatantly indicate such bias during the voir dire examination of the jury.[10] Absent such a disclosure, such jurors frequently cannot be disqualified for cause and can only be excluded by a party through the exercise of an unexplained peremptory challenge.
For example, in a criminal case, the prosecuting attorney at present may exercise a peremptory challenge against a juror *1090 whose spouse or child has recently been arrested for a crime, even though the juror insists he can follow the law and be fair to the state. Or defense counsel in a criminal case may at present exercise a peremptory challenge against a juror who has recently been victimized by the same crime for which the defendant is on trial, even though the juror insists he can follow the law and be fair to the defendant. In these and other similar-type cases, there is obviously a sound, strategic, nondiscriminatory reason why trial counsel doubts a juror's impartiality and wishes to excuse the juror on a peremptory challenge, even though the juror may not technically qualify for a challenge for cause. The peremptory challenge therefore helps rid the jury panel of covertly biased jurors and has long played an important role in guaranteeing a fair jury trial.

B
It is this objective, nondiscriminatory basis of the peremptory challenge which I think should be preserved if at all possible. This can be accomplished, I think, by expanding the traditional grounds for a challenge for cause so as to include any sound, strategic, nondiscriminatory reason why trial counsel might doubt a juror's impartiality or capacity to perform as a juror. These reasons are, in part, recognized in the post-Neil cases which have approved trial counsel's race-neutral reasons for exercising a peremptory challenge on a prospective juror following a Neil inquiry.[11] *1091 Such an expansion of the grounds for challenge for cause could be accomplished by an appropriate amendment to the applicable rules of criminal and civil procedure, see Fla.R.Crim.P. 3.300; Fla.R.Civ.P. 1.431(c), or perhaps to the applicable criminal statute, § 913.03, Fla. Stat. (1991); the abolition of the peremptory challenge itself could be accomplished by applicable rule deletions. See Fla.R.Crim.P. 3.350; Fla. R.Civ.P. 1.431(d).
Such an expanded system of jury challenges for cause, but with no peremptory challenges, would, in my view, have several important advantages over the present system. First, it would banish invidious discrimination of any kind in the jury selection process without, at the same time, engaging in divisive discrimination inquiries in open court which unfortunately characterize the present system. Second, it would be a simpler, more predictable system of jury selection to administer and would therefore result in fewer reversals on appeal and retrials. Third, it would speed up the unduly prolonged voir dire examinations of prospective jurors by focusing only on grounds for challenge for cause.
I recognize, of course, the downside to all of this, namely, that under a system of no peremptory challenges, parties will no longer have any unfettered control over who sits on their juries, a not inconsiderable loss to the overall fairness of jury trials. But it seems perfectly obvious to me that a balancing of costs and benefits is taking place in this area of law and that the verdict of the emerging case law is that the benefit derived from the unexplained use of the peremptory challenge is outweighed by the cost of invidious discrimination which such a challenge necessarily exacts.
With these reservations, then, I concur in the decision and opinion of the court.
GERSTEN, Judge (specially concurring).
I concur with the majority's conclusion seeking to expand the application of State v. Neil, 457 So.2d 481 (Fla. 1984) to "Hispanics." However, I write separately because although I find such an application to be legally desirable, I find it to be, in practice, impossible to accomplish:
Hispanics are cited as the fastest-growing minority in the United States. Seldom do such claims go beyond the intended shock effect and analyze what this means for the present and future. Much of this vagueness results from various definitions of the term Hispanic.
Teresa Sullivan, A Demographic Portrait, in Hispanics in the United States A New Social Agenda 7 (Pastora San Juan Cafferty et al. eds., 1985).
In this case, the trial court used the terms "Hispanic," "Spanish," and "Latin" indistinguishably, to label prospective jurors which were struck from the panel. The majority contends that these "Hispanic" jurors were part of an ethnic cognizable group which is protected by Neil and its progeny. The problem with the majority's result is that each of the labels encompasses a distinct and far from homogeneous group, with no "formula" to arrive at who is a member of the protected class.
The American Heritage Dictionary Second College Edition 1467 (1985) defines "ethnic" as pertaining to a religious, racial, national, or cultural group. Those generally considered in the "Hispanic" class are a result of centuries of a "melting pot" of religious, racial, national, and cultural groups. But unlike the American "melting pot," each of the subgroups has retained *1092 its own identity. Therefore each of the listed components is problematic when applied to the "class" sought to be protected:
As each element of this population's history indicates, there are many variables that divide the Hispanic population into distinctive and important sub-populations.
Sullivan 9 (1985).
Even though "Hispanics" share some characteristics, their dissimilarities make them impossible to group even for empirical research:
Empirical research has now begun to focus on the different experiences of various minority groups in the criminal system. For example, ... a 1969 study... analyzed Denver's population in terms of three distinct ethnic groups: (1) whites of non-Mexican-American extraction (2) Blacks and (3) Spanish surnames. These authors recognized that "these divisions within the community are a result of a combination of cultural and racial factors that create feelings of social difference and group identity. People of Mexican-American heritage, while tending to be Latin in appearance, have in common the Spanish language, an [sic] historical tradition, and a sense of cultural uniqueness."
Leo M. Romero and Luis G. Stelzner, Hispanics and the Criminal Justice System, in Hispanics in the United States A New Social Agenda 215 (Pastora San Juan Cafferty et al. eds., 1985).
Although socially similar, there is no doubt that "Hispanics" are ethnically distinct:
Consideration of the ethnic composition of the Hispanic population is fundamental to any discussion of this group. While Hispanics are often referred to in the aggregate, they are composed of a number of distinct groups with different heritages and very uneven geographic distribution.
Department of Health & Human Services, The Demographic and Socioeconomic Characteristics of the Hispanic Population in the United States 1950-1980 18 (1982).

RELIGIOUS CLASSIFICATION
A large section of the population of Spanish-speaking countries is Roman Catholic. However, Roman Catholicism is not the exclusive religion in these countries. Roman Catholics abound worldwide and are not exclusively "Hispanic." Accordingly, religion cannot be the standard by which this group can be defined:
It is clear ... that not all Hispanics share a . .. religious faith (Roman Catholicism)... .
Gerardo Marin and Barbara VanOss Marin, Research With Hispanic Populations 1 (1991).

RACE CLASSIFICATION
Because "Hispanic" encompasses all other races, race cannot be used as the distinguishing factor:
The term "Hispanic" is used by the Bureau of the Census as an ethnic label and not to denote a race because Hispanics belong to all of the human races (White as well as Black, Asian, and indigenous Native American). As a matter of fact, most Hispanics are racially mixed, including combinations of European White, African Black, and American Indian.
Marin 2 (1991).

NATIONAL ORIGIN CLASSIFICATION
Like religion and race, national origin is inexact as a measure of membership in the "cognizable" group. "U.S. Hispanics or their families come from one of the 19 Spanish-speaking countries in the Americas, from Puerto Rico (a commonwealth of the United States) or from Spain." Marin 4 (1991). Under this definition, the only persons considered "Hispanic" would be those who recently arrived in the United States and their immediate descendants. "[T]he Hispanic population is an immigrant population or a population made up of immigrants and their children." Sullivan 10 (1985).
The national origin standard further fails to take into account descendants of previous generations of settlers and immigrants. It should be noted that "Hispanics, notably *1093 those of the American Southwest, trace their origin to the Spanish colonists who had arrived before the United States had expanded beyond the Appalachians." Sullivan 9 (1985).
After all, Spaniards and other "Hispanics" were among the first to colonize America:
They are unlike any previous group of immigrants, perhaps because so many do not consider themselves immigrants at all. They have been here for 450 years and for 45 seconds ... They were here first, before the English, French, or Dutch. When U.S. arms seized California and the Southwest, more than three hundred years had passed since the hooves of Spanish horses had imprinted Florida's beaches, stirred the dust of Texas, and trod upon the Rio Grande Valley past the Sangre de Cristo Mountains.
Thomas Weyo, Hispanic U.S.A., Breaking the Melting Pot 1 (1988).
The Spanish-speaking colonists extended over most of the United States territory west of the Mississippi:
Given Spanish America's prosperity, the Spanish-speaking peoples at the end of the eighteenth century seemed destined to rule over the greater part of what is now the United States. The border of the Spanish empire extended to the Mississippi River. (By a secret compact concluded in 1762, France transferred its claims to "Louisiana," an enormous region west of the Mississippi, to Spain; the Spaniards remained in formal possession until 1800, when the country was retroceded to France ... Florida was a Spanish territory ... `New Spain,' the present-day Mexico, extended far into what is now the American Southwest.
L.A. Gann and Peter J. Duignan, The Hispanics in the United States 182 (1986). See also Map A (Map of Latin America).
Acknowledging that the group they seek to identify shares no religious or physical characteristics, the majority bases its identification of "Hispanics" into ancestral characteristics, "often typified by surname," and language, "the common native language being Spanish." There are major problems in transporting this definition into actual application.

SURNAME CLASSIFICATION
Literal application of the ancestral/surname approach results in non-Spanish speaking "Hispanics", i.e., Filipinos, Portuguese, Italians. In 1950 and 1960, the United States Census Bureau used a Spanish surname standard for counting "Hispanics" in the five Southwestern States. Because of the inaccuracies in such a measure, the Census Bureau dropped that standard:
The limitations inherent in the use of surnames to choose a sample can best be seen in a study of the Bureau of the Census that showed that about one-third of those who claim Hispanic origin do not have a Spanish-language surname. Furthermore, one-third of those who have Spanish-language surnames do not consider themselves Hispanic.
Marin 27 (1991).
The surname approach has an additional result of failing to account for "Hispanics" who either through marriage or adoption obtain an English surname. Similarly, surname classifications fail to consider "Hispanics" whose surnames are not commonly considered Spanish, whose surnames are a result of varied European ancestry, whose surnames have been Anglicized, or whose surnames are derived from other than Castillian Spain, i.e. Basques, Catalans, etc.:
It is possible, for example, for Hispanics to have non-Spanish-language surnames (particularly among individuals with Argentinian, Chilean, Uruguayan, Venezuelan, and Paraguayan ancestry) that would exclude them ... Non-Spanish surnames (e.g., Banchs, Dols, Galtieri, Cristiani, Domecq) are frequently found among Latin Americans but are not found in the Spanish surname lists... .
Marin 27-28 (1991). Even appellant herein would not be considered Hispanic under this category.
The surname approach would also lead to classifying as "Hispanic" others who share *1094 the surnames and the language. Until 1968 and 1976, respectively, Spain governed Equatorial Guinea and Morocco, as well as other African settlements of Rio de Oro and Ifni. Although not the intended result, Africans from these settlements would be engulfed by this category. These Spanish colonies also illustrate the problem of using language as the standard for determining who is a "Hispanic."

LANGUAGE CLASSIFICATION
Conversely, many "Hispanics" do not speak Spanish. Many who do, speak variations of the language:
The Spanish spoken in the Southwest was widely varied. There was the street slang of Los Angeles, remnants of archaic Castillian in New Mexican Spanish, and there were expressions known to Chicanos alone, not to Mexicans. Conversational Spanish was in constant flux.
Gann 182 (1986).
Many descendants of Spanish-speaking immigrants, no longer know how to speak Spanish. This lack of language would then deprive them of the protection of the cognizable class, while admitting questionable others:
While national data on language proficiency among Hispanics are not available, the 1980 census showed that well over 3 million people (5 years of age and older) speak only English although others in their household speak Spanish. If those households are assumed to be Hispanic, it could be estimated that at least 20% of Hispanics speak only English. Non-Hispanics who speak Spanish fluently represent an additional source of misclassification ... This phenomenon may be particularly serious in those areas of the country where the proportion of Hispanics is significant and where Spanish has become a prominent language for business transactions (e.g., parts of California, Florida, New York, New Jersey, and Texas).
Marin 29 (1991).
Finally the majority refers to a common "native language being Spanish." However, with few exceptions, each of the countries from which today's "Hispanics" are derived, including Spain, were originally inhabited by indigenous tribes. The language of these indigenous tribes, is their "native language."

THE DEFINITIONAL PROBLEM DISCUSSION
The term "Hispanic" is far from being an accepted classification:
We have chosen to use the label "Hispanic" in this book ... Nevertheless, this label is not only very recent but it is not universally accepted by the individuals it is used to describe.
Marin 18 (1991). In fact, the use of the term "Hispanic" is a governmentally contrived term:
"Hispanic" as an ethnic label is the product of a decision by the Office of Management and Budget (OMB) in 1978 to operationalize the label as "A person of Mexican, Puerto Rican, Cuban, Central or South American or other Spanish culture or origin, regardless of race." (Federal Register, 1978, p. 19269).
Marin 20 (1991).
The OMB definition creates further applicational problems. By including South Americans, that definition also includes residents and descendants of Belize, Brazil, British and French Guayana. By including "other Spanish culture or origin," it includes Filipinos, and all other Spanish colonies, including those in Africa. In practice, the OMB definition does not include Spain, nor Spanish colonies in other continents, although Spaniards and their descendants are certainly of "Spanish culture or origin."
Another common label used to define this group is that of "Latins" or "Latinos". Without a doubt the label of "Latins" raises as many problems as "Hispanics":
[A] careful reading of the etymology of "Latino" would force us to accept as Hispanics those individuals who trace their cultural roots to European Roman/Latin influence (France, Italy, Rumania, Spain, Portugal).
Marin 22 (1991). See also Map B (Map of the Roman Empire).
*1095 The problem is not the label attached to the group. Other labels have been used: Latin Americans, Chicano, Raza, Spanish. The problem is that if the United States government, accomplished authors, statisticians, linguists, etc. have been unable to define what is a "Hispanic," with some precision and clarity, how is a trial judge to determine which juror can be stricken and which is protected? As noted:
Since the Spanish origin definition is a subjective one and no satisfactory objective definition for this population can be devised, it is obvious that there will be some definitional variation... .
Department of Health & Human Services 18 (1982).
Some would suggest that a method to ascertain membership in the cognizable class is by self-identification. However, this method has been shown to be far from reliable:
This approach has the obvious limitation that some individuals may identify with a specific subgroup label ... and not use the larger, more encompassing labels. An additional limitation to this approach is the fact that some respondents may dislike those labels and would reply negatively to that type of query.
Marin 29 (1991).
A study of the 1980 Census reveals that six percent of those who self-identified as Hispanics, were not, ten percent of those who did not were, fifty percent of those who did not self-identify as Hispanic reported a Hispanic place of birth ancestry, or surname and spoke Spanish, and nineteen percent of those who did not self identify as Hispanic had a Hispanic surname.

Size of Hispanic Population According to Six Identifiers, United States and
 Southwestern States, 1 April 1970
---------------------------------------------------------------------------
Identifier United States Southwestern States[1]
---------------------------------------------------------------------------
Spanish origin[2] 9,072,602 5,008,556
Spanish surname n/a 4,667,975
Spanish language[3] 9,589,216 5,662,700
Spanish heritage[4] 9,294,509 6,188,362
Spanish language or surname 10,114,878 6,188,362
Spanish birth or parentage[5] 5,241,892 2,321,642
---------------------------------------------------------------------------
n/a = not applicable

[S]elf-identification is by no means a problem-free identifier. Individuals' responses as Hispanic or non-Hispanic may vary from one time to the next.
Sullivan 13 (1985).

CONCLUSION
My brother Judge Hubbart has written a concurrence with which I agree except that he would, in light of these developments, advocate the demise of peremptory challenges. I disagree.
Peremptory challenges have a long history in Florida dating to 1828. See Act of Nov. 19, 1828, s. 14. The exercise of peremptory challenges has been held to be:

*1096 [E]ssential to the fairness of a trial by jury and has been described as one of the most important rights secured to a defendant.
Francis v. State, 413 So.2d 1175 (Fla. 1982) (citing Pointer v. United States, 151 U.S. 396, 14 S.Ct. 410, 38 L.Ed. 208 (1894) and Lewis v. United States, 146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011 (1892)).
Because I find that the application of Neil to "Hispanics" is impossible, I cannot join the majority's reasoning. Because I find that the need filled by peremptory challenges has not been otherwise addressed, I cannot advocate its abolishment. Because I find that an impartial jury free from group bias is essential to our system of justice, I concur.
*1097 
*1098 
NOTES
[1] In requesting the inquiry, defense counsel referred to the jurors alternately as "Spanish" and "Latin." This court recognizes those terms and also uses the term "Hispanic." We make no attempt to distinguish the words.
[2] Clarified, State v. Castillo, 486 So.2d 565 (Fla. 1986), and clarified, State v. Slappy, 522 So.2d 18 (Fla.), cert. denied, 487 U.S. 1219, 108 S.Ct. 2873, 101 L.Ed.2d 909 (1988).
[1] See, e.g., Castaneda v. Partida, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977) (ethnic or national origin: Mexican Americans); Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975) (gender: women); Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954) (ethnic or national origin: Mexican Americans); Ballard v. United States, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946) (gender: women); Thiel v. Southern Pac. Co., 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946) (wealth: low economic or social status); Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664 (1879) (race: African Americans); Willis v. Zant, 720 F.2d 1212 (11th Cir.1983) (age: young persons age 18-30), cert. denied, 467 U.S. 1256, 104 S.Ct. 3546, 82 L.Ed.2d 849 (1984) and cert. denied, 467 U.S. 1256, 104 S.Ct. 3548, 82 L.Ed.2d 851 (1984); State v. Guirlando, 152 La. 570, 93 So. 796 (1922) (ethnic or national origin: Italian Americans).
[2] Jewish Americans might also qualify for Neil protection as a protected religious group.
[3] The state often does this in criminal cases; the defendant often does this in personal injury civil cases.
[4] The defendant often does this in criminal cases; the plaintiff often does this in personal injury civil cases. Wealth or the lack of it is often judged by the occupation of the prospective juror.
[5] The state often does this in criminal cases where the defendant is a teenager or a young adult.
[6] The defendant often does this in criminal cases involving sexual battery where a woman is the victim.
[7] The state often does this in criminal cases involving sexual battery where a woman is the victim.
[8] This is often done by both sides in civil and criminal cases.
[9] Indeed, the post-Neil cases have consistently struck down counsel's subjective impressions of jurors as constituting a pretext for exercising a peremptory challenge, once the initial discriminatory showing has been made. Williams v. State, 574 So.2d 136 (Fla. 1991) (challenge of juror because she was not really responsive to the questions and was not paying close attention deemed insufficient); Floyd v. State, 569 So.2d 1225 (Fla. 1990) (failure of a juror to react emotionally one way or another to questioning on voir dire not a reasonably clear and specific explanation), cert. denied, ___ U.S. ___, 111 S.Ct. 2912, 115 L.Ed.2d 1075 (1991); American Sec. Ins. Co. v. Hettel, 572 So.2d 1020 (Fla. 2d DCA 1991) (dislike of the manner in which the juror answered counsel's questions and juror's apparent disinterest in case or in sitting on jury not sufficiently clear and specific racially neutral reason for challenge); Foster v. State, 557 So.2d 634 (Fla. 3d DCA 1990) (that prosecutor does not get a "good feeling" about a juror is not racially neutral).

In the instant case, the court implicitly strikes down a similar subjective impression as constituting a pretext as well. After the state had excused two of the four Hispanic jurors on the venire and the trial court ruled that the state was required to explain these peremptory challenges, the assistant state attorney below candidly admitted that he had no objective reason for challenging Ms. Arjona as a juror, rather than a non-Hispanic juror, in order to reach another juror, Ms. Fernandez, whom he liked (T. 82-83); his reason for striking Ms. Arjona was purely subjective, to wit: "Scott, my colleague ... just doesn't like her." (R.82) The court, quite properly, concludes that this peremptory challenge was "ethnically motivated" and therefore "constitutionally forbidden." Maj. op. at 1085. It is, of course, settled that "in the context of Neil it would be incumbent on the prosecutor to give non racial reasons for having challenged the black jurors rather than the white jurors in his effort to make room for the new persons he sought to have join the panel." Kibler v. State, 546 So.2d 710, 714 (Fla. 1989).
[10] Section 913.03(10), Florida Statutes (1991), narrowly restricts the usual "bias" ground for a challenge for cause in a criminal case to a juror who

"has a state of mind regarding the defendant, the case, the person alleged to have been injured by the offense charged, or the person on whose complaint the prosecution was instituted that will prevent him from acting with impartiality, but the formation of an opinion or impression regarding the guilt or innocence of the defendant shall not be a sufficient ground for challenge to a juror if he declares and the court determines that he can render an impartial verdict according to the evidence."
Fla.R.Civ.P. 1.431(c)(1) similarly restricts the usual "bias" ground for a challenge for cause in a civil case to a juror who "has formed or expressed any opinion or is sensible of any bias or prejudice concerning [the action]" or who "does not stand indifferent to the action." Obviously, these grounds, as stated, require a high threshold for excusing a juror for cause, and, as a result, most trial judges are reluctant to grant such a challenge.
[11] The following have been approved as race-neutral reasons for exercising a peremptory challenge following a Neil inquiry:

1. INABILITY TO FOLLOW THE LAW. Jurors who express difficulty in either understanding or following the law have been held to be reasonably excluded. See McNair v. State, 579 So.2d 264 (Fla. 2d DCA 1991) (inability to understand the presumption of innocence); Foster v. State, 557 So.2d 634 (Fla. 3d DCA 1990) (potential jurors could not follow the law unless compelled).
2. INTELLECTUAL INFIRMITY. Several cases have approved exclusion of individuals who appeared intellectually incapable of performing their duties as jurors. See Valle v. State, 581 So.2d 40, 44 nn. 3-4 (Fla. 1991) (juror did not appear to have sense or intellectual capacity to understand the case), cert. denied, ___ U.S. ___, 112 S.Ct. 597, 116 L.Ed.2d 621 (1991); Stephens v. State, 559 So.2d 687, 690 (Fla. 1st DCA 1990) (juror had apparent difficulty reading the jury questionnaire), approved, 572 So.2d 1387 (Fla. 1991); Smith v. Coastal Emergency Servs., 538 So.2d 946 (Fla. 4th DCA 1989) (juror's age, educational background and profession led counsel to believe he would be incapable of processing information in a medical malpractice case).
3. ASSOCIATION WITH PERSONS INVOLVED IN THE CASE. Where potential jurors are acquainted with the parties, their counsel, or any witnesses, it has been held reasonable to exclude them. See Cure v. State, 564 So.2d 1251 (Fla. 4th DCA 1990) (an ex-sheriff's investigator who was acquainted with a detective witness); Lennon v. State, 560 So.2d 308 (Fla. 1st DCA) (juror had close association or familiarity with the defendant and/or his family), rev. denied, 574 So.2d 141 (Fla. 1990); McKinnon v. State, 547 So.2d 1254 (Fla. 4th DCA 1989) (juror seen talking to codefendant's child); Smith v. Coastal Emergency Servs.; 538 So.2d 946 (juror knew plaintiff).
4. ASSOCIATION WITH LAW ENFORCEMENT. It has been held reasonable for the defendant in criminal cases to exclude potential jurors who are associated with law enforcement personnel. See Valle v. State, 581 So.2d at 44, nn. 3-4 (juror's son who was a police officer killed in the line of duty); McNair v. State, 579 So.2d 264 (juror's sister worked in the state attorney's office); Cure v. State, 564 So.2d 1251 (juror was ex-sheriff's investigator). Similarly, it has been held reasonable for the plaintiff in a medical malpractice case to challenge prospective jurors because of their close ties to the medical community. Hall v. Daee, 570 So.2d 296 (Fla. 3d DCA 1990).
5. PAST CRIMINAL PROSECUTION OR INVOLVEMENT IN CONDUCT BEING TRIED. In criminal cases, courts have generally approved challenges by the state to potential jurors who have either been charged with crimes or had close relatives who were so charged. Files v. State, 586 So.2d 352 (Fla. 1st DCA 1991) (juror had prior DUI conviction); Valle v. State, 581 So.2d at 44, nn. 3-4 (juror with family members who had been prosecuted, in prison and/or represented by the public defender's office); Stephens v. State, 559 So.2d at 690 (one juror had a criminal record; another juror had previously been arrested on the same charge as defendant); Knight v. State, 559 So.2d 327 (Fla. 1st DCA) (juror had felony conviction record and had recently been prosecuted by the local prosecutor's office), rev. denied, 574 So.2d 141 (Fla. 1990); Thomas v. State, 502 So.2d 994 (Fla. 4th DCA 1987) (one juror had a close relative charged with murder, which trial she attended and had recently been involved in an assault and battery; another juror had acquaintances who had been arrested), rev. denied, 509 So.2d 1119 (Fla. 1987); Taylor v. State, 491 So.2d 1150 (Fla. 4th DCA) (one juror had a relative accused of murder and another had a son in prison), rev. denied, 501 So.2d 1284 (Fla. 1986).
In civil cases, it has been held that a juror may reasonably be excused if he or she was involved in the same type of action being litigated. See Smellie v. Torres, 570 So.2d 314 (Fla. 3d DCA 1990) (in automobile accident case, juror who had made a past accident claim and had one pending), rev. denied, 582 So.2d 624 (Fla. 1991); Smith v. Coastal Emergency Servs., 538 So.2d 946 (in medical malpractice case, juror had recently received unsatisfactory emergency room treatment).
6. ILLNESS OR PHYSICAL IMPAIRMENT. Upon a proper showing it has been held that a potential juror may be reasonably stricken if he has a health problem or physical impairment. State v. Slappy, 522 So.2d at 23 (illness); Knight v. State, 559 So.2d 327 (hearing problem and use of medication); Taylor v. State, 491 So.2d 1150 (illness).
[1] Arizona, California, Colorado, New Mexico, and Texas.
[2] Self-identification.
[3] All persons of Spanish mother tongue and all other persons in families which the head or wife reported Spanish mother tongue.
[4] An identifier which combined the following: persons of Spanish language or surname in the five Southwestern states, persons of Puerto Rican birth or parentage in the Three Middle Atlantic states, and persons of Spanish language in the remaining states and the District of Columbia.
[5] An identifier that refers to country of birth of the person's parents. Source: Siegel and Passel (1979).