Justice Breyer,
concurring.
In Batson v. Kentucky, 476 U. S. 79 (1986), the Court adopted a burden-shifting rule designed to ferret out the unconstitutional use of race in jury selection. In his separate opinion, Justice Thurgood Marshall predicted that the Court’s rule would not achieve its goal. The only way to *267 “end the racial discrimination that peremptories inject into the jury-selection process,” he concluded, was to “eliminat[e] peremptory challenges entirely.” Id., at 102-103 (concurring opinion). Today’s case reinforces Justice Marshall’s concerns.
I
To begin with, this case illustrates the practical problems of proof that Justice Marshall described. As the Court’s opinion makes clear, Miller-El marshaled extensive evidence of racial bias. But despite the strength of his claim, Miller-El’s challenge has resulted in 17 years of largely unsuccessful and protracted litigation — including 8 different judicial proceedings and 8 different judicial opinions, and involving 23 judges, of whom 6 found the Batson standard violated and 16 the contrary.
The complexity of this process reflects the difficulty of finding a legal test that will objectively measure the inherently subjective reasons that underlie use of a peremptory challenge. Batson seeks to square this circle by (1) requiring defendants to establish a prima facie case of discrimination, (2) asking prosecutors then to offer a race-neutral explanation for their use of the peremptory, and then (3) requiring defendants to prove that the neutral reason offered is pretextual. See ante, at 239. But Batson embodies defects intrinsic to the task.
At Batson’s first step, litigants remain free to misuse peremptory challenges as long as the strikes fall below the prima facie threshold level. See 476 U. S., at 105 (Marshall, J., concurring). At Batson’s second step, prosecutors need only tender a neutral reason, not a “persuasive, or even plausible,” one. Purkett v. Elem, 514 U. S. 765, 768 (1995) (per curiam); see also id., at 766 (“‘mustaches and the beards look suspicious’”). And most importantly, at step three, Batson asks judges to engage in the awkward, sometime hopeless, task of second-guessing a prosecutor’s instinctive judgment — the underlying basis for which may be invisible *268 even to the prosecutor exercising the challenge. See 476 U. S., at 106 (Marshall, J., concurring) (noting that the unconscious internalization of racial stereotypes may lead litigants more easily to conclude “that a prospective black juror is ‘sullen/ or ‘distant/” even though that characterization would not have sprung to mind had the prospective juror been white); see also Page, Batson’s Blind-Spot: Unconscious Stereotyping and the Peremptory Challenge, 85 B. U. L. Rev. 155, 161 (2005) (“ ‘[sjubtle forms of bias are automatic, unconscious, and unintentional’” and “‘escape notice, even the notice of those enacting the bias’” (quoting Fiske, What’s in a Category?: Responsibility, Intent, and the Avoidability of Bias Against Outgroups, in The Social Psychology of Good and Evil 127, 127-128 (A. Miller ed. 2004))). In such circumstances, it may be impossible for trial courts to discern if a “ ‘seat-of-the-pants’ ” peremptory challenge reflects a “ ‘seat-of-the-pants’ ” racial stereotype. Batson, 476 U. S., at 106 (Marshall, J., concurring) (quoting id., at 138 (Rehnquist, J., dissenting)).
Given the inevitably clumsy fit between any objectively measurable standard and the subjective decisionmaking at issue, I am not surprised to find studies and anecdotal reports suggesting that, despite Batson, the discriminatory use of peremptory challenges remains a problem. See, e. g., Baldus, Woodworth, Zuckerman, Weiner, & Broffitt, The Use of Peremptory Challenges in Capital Murder Trials: A Legal and Empirical Analysis, 3 U. Pa. J. Const. L. 3, 52-53, 73, n. 197 (2001) (in 317 capital trials in Philadelphia between 1981 and 1997, prosecutors struck 51% of black jurors and 26% of nonblack jurors; defense counsel struck 26% of black jurors and 54% of nonblack jurors; and race-based uses of prosecutorial peremptories declined by only 2% after Bat-son)', Rose, The Peremptory Challenge Accused of Race or Gender Discrimination? Some Data from One County, 23 Law and Human Behavior 695, 698-699 (1999) (in one North Carolina county, 71% of excused black jurors were removed *269 by the prosecution; 81% of excused white jurors were removed by the defense); Tucker, In Moore’s Trials, Excluded Jurors Fit Racial Pattern, Washington Post, Apr. 2, 2001, p. Al (in D. C. murder case spanning four trials, prosecutors excused 41 blacks or other minorities and 6 whites; defense counsel struck 29 whites and 13 black venire members); Mize, A Legal Discrimination; Juries Aren’t Supposed to be Picked on the Basis of Race and Sex, But It Happens All the Time, Washington Post, Oct. 8, 2000, p. B8 (authored by judge on the D. C. Superior Court); see also Melilli, Batson in Practice: What We Have Learned About Batson and Peremptory Challenges, 71 Notre Dame L. Rev. 447, 462-464 (1996) (finding Batson challenges’ success rates lower where peremptor-ies were used to strike black, rather than white, potential jurors); Brand, The Supreme Court, Equal Protection and Jury Selection: Denying That Race Still Matters, 1994 Wis. L. Rev. 511, 583-589 (examining judicial decisions and concluding that few Batson challenges succeed); Note, Batson v. Kentucky and J. E. B. v. Alabama ex rel T. B.: Is the Peremptory Challenge Still Preeminent? 36 Boston College L. Rev. 161, 189, and n. 303 (1994) (same); Montoya, The Future of the Post -Batson Peremptory Challenge: Voir Dire by Questionnaire and the “Blind” Peremptory, 29 U. Mich. J. L. Reform 981, 1006, nn. 126-127, 1035 (1996) (reporting attorneys’ views on the difficulty of proving Batson claims).
II
Practical problems of proof to the side, peremptory challenges seem increasingly anomalous in our judicial system. On the one hand, the Court has widened and deepened Bat-son’s basic constitutional rule. It has applied Batson’s anti-discrimination test to the use of peremptories by criminal defendants, Georgia v. McCollum, 505 U. S. 42 (1992), by private litigants in civil cases, Edmonson v. Leesville Concrete Co., 500 U. S. 614 (1991), and by prosecutors where the defendant and the excluded juror are of different races, Powers *270 v. Ohio, 499 U. S. 400 (1991). It has recognized that the Constitution protects not just defendants, but the jurors themselves. Id., at 409. And it has held that equal protection principles prohibit excusing jurors on account of gender. See J. E. B. v. Alabama ex rel. T. B., 511 U. S. 127 (1994). Some lower courts have extended Batson’s rule to religious affiliation as well. See, e. g., United States v. Brown, 352 F. 3d 654, 668-669 (CA2 2003); State v. Hodge, 248 Conn. 207, 244-246, 726 A. 2d 531, 553 (1999); United States v. Stafford, 136 F. 3d 1109, 1114 (CA7 1998) (suggesting same); see also Davis v. Minnesota, 511 U. S. 1115, 1117 (1994) (Thomas, J., dissenting from denial of certiorari). But see Casarez v. State, 913 S. W. 2d 468, 496 (Tex. Crim. App. 1994) (en banc) (declining to extend Batson to religious affiliation); State v. Davis, 504 N. W. 2d 767, 771 (Minn. 1993) (same).
On the other hand, the use of race- and gender-based stereotypes in the jury-selection process seems better organized and more systematized than ever before. See, e. g., Post, A Loaded Box of Stereotypes: Despite ‘Batson,’ Race, Gender Play Big Roles in Jury Selection., Nat. L. J., Apr. 25, 2005, pp. 1, 18 (discussing common reliance on race and gender in jury selection). For example, one jury-selection guide counsels attorneys to perform a “demographic analysis” that assigns numerical points to characteristics such as age, occupation, and marital status — in addition to race as well as gender. See V. Starr & M. McCormick, Jury Selection 193-200 (3d ed. 2001). Thus, in a hypothetical dispute between a white landlord and an African-American tenant, the authors suggest awarding two points to an African-American venire member while subtracting one point from her white counterpart. Id., at 197-199.
For example, a bar journal article counsels lawyers to “rate” potential jurors “demographically (age, gender, marital status, etc.) and mark who would be under stereotypical circumstances [their] natural enemies and allies.” Drake, *271 The Art of Litigating: Deselecting Jurors Like the Pros, 34 Md. Bar J. 18, 22 (Mar./Apr. 2001) (emphasis in original).
For example, materials from a legal convention, while noting that “nationality” is less important than “once was thought,” and emphasizing that “the answers a prospective juror gives to questions are much more valuable,” still point out that “[sjtereotypically” those of “Italian, French, and Spanish” origin “are thought to be pro-plaintiff as well as other minorities, such as Mexican and Jewish[;] [pjersons of German, Scandinavian, Swedish, Finnish, Dutch, Nordic, British, Scottish, Oriental, and Russian origin are thought to be better for the defense”; African-Americans “have always been considered good for the plaintiff,” and “[m]ore politically conservative minorities will be more likely to lean toward defendants.” Blue, Mirroring, Proxemics, Nonverbal Communication, and Other Psychological Tools, Advocacy Track — Psychology of Trial, Association of Trial Lawyers of America Annual Convention Reference Materials, 1 Ann. 2001 ATLA-CLE 153, available at WESTLAW, ATLA-CLE database (June 8, 2005).
For example, a trial consulting firm advertises a new jury-selection technology: “Whether you are trying a civil case or a criminal case, SmartJURY™ has likely determined the exact demographics (age, race, gender, education, occupation, marital status, number of children, religion, and income) of the type of jurors you should select and the type you should strike.” SmartJURY Product Information, http://www.ets-america.com/smartjury_pi.asp (as visited June 8, 2005, and available in Clerk of Court’s case file).
These examples reflect a professional effort to fulfill the lawyer’s obligation to help his or her client. Cf. J. E. B., supra, at 148-149 (O’Connor, J., concurring) (observing that jurors’ race and gender may inform their perspective). Nevertheless, the outcome in terms of jury selection is the same as it would be were the motive less benign. And as long as that is so, the law’s antidiscrimination command and *272 a peremptory jury-selection system that permits or encourages the use of stereotypes work at cross-purposes.
Finally, a jury system without peremptories is no longer unthinkable. Members of the legal profession have begun serious consideration of that possibility. See, e. g., Alen v. State, 596 So. 2d 1083, 1088-1089 (Fla. App. 1992) (Hubbart, J., concurring); Broderick, Why the Peremptory Challenge Should Be Abolished, 65 Temp. L. Rev. 369 (1992) (authored by Senior Judge on the U. S. District Court for the Eastern District of Pennsylvania); Hoffman, Peremptory Challenges Should be Abolished: A Trial Judge’s Perspective, 64 U. Chi. L. Rev. 809 (1997) (authored by a Colorado state-court judge); Alschuler, The Supreme Court and the Jury: Voir Dire, Peremptory Challenges, and the Review of Jury Verdicts, 56 U. Chi. L. Rev. 153, 199-211 (1989); Amar, Reinventing Juries: Ten Suggested Reforms, 28 U. C. D. L. Rev. 1169, 1182-1183 (1995); Melilli, 71 Notre Dame L. Rev., at 502-503; Page, 85 B. U. L. Rev., at 245-246. And England, a common-law jurisdiction that has eliminated peremptory challenges, continues to administer fair trials based largely on random jury selection. See Criminal Justice Act, 1988, ch. 33, § 118(1), 22 Halsbury’s Statutes 357 (4th ed. 2003 reissue) (U. K.); see also 2 Jury Service in Victoria, Final Report, ch. 5, p. 165 (Dec. 1997) (1993 study of English barristers showed majority support for system without peremptory challenges).
Ill
I recognize that peremptory challenges have a long historical pedigree. They may help to reassure a party of the fairness of the jury. But long ago, Blackstone recognized the peremptory challenge as an “arbitrary and capricious species of [a] challenge.” 4 W. Blackstone, Commentaries on the Laws of England 346 (1769). If used to express stereotypical judgments about race, gender, religion, or national origin, peremptory challenges betray the jury’s democratic origins and undermine its representative function. See 1 A. de *273 Tocqueville, Democracy in America 287 (H. Reeve transl., rev. ed. 1900) (“[T]he institution of the jury raises the people ... to the bench of judicial authority [and] invests [them] with the direction of society”); A. Amar, The Bill of Rights 94-96 (1998) (describing the Founders’ vision of juries as venues for democratic participation); see also Stevens, Foreword, Symposium: The Jury at a Crossroad: The American Experience, 78 Chi.-Kent L. Rev. 907,907-908 (2008) (citizens should not be denied the opportunity to serve as jurors unless an impartial judge states a reason for the denial, as with a strike for cause). The “scientific” use of peremptory challenges may also contribute to public cynicism about the fairness of the jury system and its role in American government. See, e. g., S. O’Connor, Juries: They May Be Broke, But We Can Fix Them, Chautauqua Institution Lecture, July 6,1995. And, of course, the right to a jury free of discriminatory taint is constitutionally protected — the right to use peremptory challenges is not. See Stilson v. United States, 250 U. S. 583, 586 (1919); see also Ross v. Oklahoma, 487 U. S. 81, 88 (1988) (defendant’s loss of a peremptory challenge does not violate his right to an impartial jury).
Justice Goldberg, dissenting in Swain v. Alabama, 380 U. S. 202 (1965), wrote, ‘Were it necessary to make an absolute choice between the right of a defendant to have a jury chosen in conformity with the requirements of the Fourteenth Amendment and the right to challenge peremptorily, the Constitution compels a choice of the former.” Id., at 244; see also Batson, 476 U. S., at 107 (Marshall, J., concurring) (same); Edmonson, 500 U. S., at 630 (opinion for the Court by Kennedy, J.) (“[I]f race stereotypes are the price for acceptance of a jury panel as fair, the price is too high to meet the standard of the Constitution”). This case suggests the need to confront that choice. In light of the considerations I have mentioned, I believe it necessary to reconsider Batson’s test and the peremptory challenge system as a whole. With that qualification, I join the Court’s opinion.